685 F.2d 1162
 8 Media L. Rep. 2177
 UNITED STATES of America, Plaintiff-Appellee,
v.
Dominick Phillip BROOKLIER, Samuel Orlando Sciortino, Louis
Tom Dragna, Michael Rizzitello, Jack Locicero, Defendants,
The Times Mirror Company, Publisher of the Los Angeles
Times, and Gene Blake, Non-Party Appellants.
The TIMES MIRROR COMPANY and Gene Blake, Petitioners,
v.
UNITED STATES DISTRICT COURT FOR the CENTRAL DISTRICT OF
CALIFORNIA, Respondent,
and
Dominick Phillip Brooklier, et al., Real Parties.
 Nos. 80-5808, 80-7556.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Jan. 14, 1981.
Decided Aug. 31, 1982.
 
 Robert S. Warren, Gibson, Dunn & Crutcher, Los Angeles, Cal., for Time Mirror Co.
 Frank Gooch, Flint & MacKay, Los Angeles, Cal., for amicus Hearst.
 Michael D. Dempsey, Rogers & Wells, Los Angeles, Cal., for Newsweek, Assoc. Press.
 Howard Gillingham, Los Angeles, Cal., for Brooklier, et al.
 Alexander Williams, Asst. U. S. Atty., Los Angeles, Cal., for U. S. A.
 Appeal from the United States District Court for the Central District of California.
 Before BROWNING, Chief Judge, KENNEDY and HUG, Circuit Judges.
 BROWNING, Chief Judge:
 
 
 1
 An indictment was returned charging a number of defendants with violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) 18 U.S.C. §§ 1961-1968. The indictment alleged defendants were members of a criminal enterprise known as "La Cosa Nostra" engaged in extorting money from dealers in pornographic material through violence and fear, and had committed other illegal acts, including murder, to prevent exposure of the extortion scheme.
 
 
 2
 The Times Mirror Company, a newspaper publisher, and Gene Blake, a Times Mirror reporter, seek review by appeal and petition for mandamus of four orders of the district court barring access by the media and the public to certain portions of the proceedings under the indictment.
 
 
 3
 Times Mirror and Blake filed an Emergency Petition for Writ of Mandamus or Prohibition and a notice of appeal in this court while the trial was still in progress. Argument was heard on the petition. On the same day the jury returned a verdict convicting the defendants. The district court released the transcripts of the closed proceedings. This court declined to issue an emergency writ and consolidated the petition for writ of mandamus with the pending appeal.
 
 I.
 
 4
 Although the trial has long since ended and transcripts of the closed proceedings have been released, the controversy is not moot since closure orders of the kind involved here are capable of repetition, yet evade review. Globe Newspaper Co. v. Superior Court, --- U.S. ----, ----, 102 S.Ct. 2613, 2618, 73 L.Ed.2d 248 (1982); Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 563, 100 S.Ct. 2814, 2821, 65 L.Ed.2d 973 (1980); Gannett Co. v. De Pasquale, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979); Sacramento Bee v. United States District Court, 656 F.2d 477, 480 (9th Cir. 1981).
 
 
 5
 The United States suggests closure is not likely to be repeated in view of the recent adoption and implementation by the Department of Justice of regulations recognizing "the vital public interest in open judicial proceedings," and the government's "general overriding affirmative duty to oppose their closure." 28 C.F.R. § 50.9. We are not persuaded. The government did not seek the closures that occurred in this case, and nothing in the record suggests opposition by the government would have prevented them.
 
 II.
 
 6
 This circuit has not recognized standing to appeal in persons such as Times Mirror and Blake who, though denied access to the proceedings, were not parties to the case below. United States v. Sherman, 581 F.2d 1358, 1360 (9th Cir. 1978). But see United States v. Criden, 675 F.2d 550, 552 (3d Cir. 1982); Belo Broadcasting Co. v. Clark, 654 F.2d 423, 425-26 (5th Cir. 1981); United States v. Hubbard, 650 F.2d 293, 309 (D.C.Cir.1980). The appeal is therefore dismissed.
 
 
 7
 We have, however, recognized standing in such persons to seek review by petition for writ of mandamus of orders denying them access to the proceedings. United States v. Sherman, supra, 581 F.2d at 1360; Sacramento Bee, supra, 656 F.3d at 480-81. We therefore review the closure orders entered here on the petition for mandamus.
 
 III.
 
 8
 Petitioners challenge four orders of the district court: an order partially closing the voir dire of prospective jurors; an order closing a hearing on a motion by a defendant to exclude from evidence a statement given by the defendant to the FBI; an order closing a hearing on a motion by a non-party to exclude from evidence certain tapes of interviews between the non-party and a government witness; and an order refusing to release the transcripts of these three in camera proceedings immediately rather than at the close of trial.
 
 
 9
 Petitioners contend each of these orders violates the first amendment right of the public, including the media, to access to criminal proceedings established by Richmond Newspapers, supra, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973. We do not reach the questions whether the closure orders were justified. We conclude that the district court did not satisfy the procedural prerequisites to entry of a closure order reflected in Gannett, Richmond Newspapers, and Globe Newspaper.
 
 
 10
 We consider the orders in turn.
 
 A. Voir Dire
 
 11
 Two earlier indictments had been quashed, and pretrial proceedings under the third indictment were protracted. Three years elapsed between the return of the original indictment and the commencement of jury selection. The prosecution excited considerable public interest, and media coverage was fairly extensive during this period.
 
 
 12
 Selection of the jury began September 30, 1980. After questioning the potential jurors as a group in open court, the trial judge closed the voir dire to the media and the public and questioned prospective jurors individually in camera.
 
 
 13
 The record reveals no contemporaneous objection. When the voir dire began the next day, however, the trial judge noted there had been "a flurry of inquiries from the media wanting to know why they cannot be in my chambers, too." The court stated formal motions might be filed by the media based upon Gannett, and the court had therefore re-examined Gannett and had concluded that "on any sort of balancing test" the defendants' sixth amendment rights required closure. Later that day, the court announced it had received a note from a newspaper reporter requesting the remaining voir dire be opened. Defense counsel objected. The court indicated the request would be denied.
 
 
 14
 Two days later, on October 2, counsel for CBS, Inc., was heard in open court on an oral motion to open the voir dire. Counsel for defense and the government indicated they did not wish to change the in camera procedure, and the court denied CBS's motion.
 
 
 15
 The court noted it had rejected sequestering the jury as "a more extreme measure" than closure of a portion of the voir dire. The court stated it had weighed the first amendment rights of the media against the sixth amendment rights of the defendants in deciding to conduct individualized voir dire in chambers. The only specific reason given by the court for adopting this procedure was that potential jurors would answer more freely and spontaneously if questioned alone rather than in the presence of other potential jurors, and without hearing the others' answers. At a later point in the record, the court stated the voir dire was not closed to keep the media and the public out but to keep the other jurors away, "to have as small a setting as possible to elicit from the individual jurors some of the more initmate kinds of thinking on their part... It couldn't be done in as large a setting as would be required if we were to have the media present as well." The court repeated that after weighing the first and sixth amendment rights involved, the court believed it was necessary to continue to exclude the media from the voir dire of individual jurors "to give defendants as fair a trial as they can possibly have." The court referred to the "problems of publicity," described later in the record as a "large amount of (publicity) that could in some way prejudice them from being fair jurors." The court concluded, "it has become my duty to try to insulate these jurors from that as much as possible to insure that we have a fair and impartial jury." The court said a daily transcript of the voir dire was being prepared and would be made available and that the court did not anticipate any other portion of the case would be closed. The voir dire remained closed until concluded on October 10.
 
 
 16
 The government contends the public's first amendment right of access to criminal proceedings recognized in Richmond Newspapers applies only to "trials," that voir dire is a pre-trial procedure, and that the public therefore has no right of access to voir dire. We disagree. The voir dire is generally considered "part of the trial itself," Commercial Printing Co. v. Lee, 262 Ark. 87, 553 S.W.2d 270, 271 (1977); Great Falls Tribune v. District Court, 608 P.2d 116, 120-21 (Mont.1980). The Eighth Circuit has applied the right of public access to the voir dire without discussion. United States ex rel. Pulitzer Publishing Co., 635 F.2d 676 (8th Cir. 1980).
 
 
 17
 Moreover, the two principal considerations underlying the public's first amendment right of access to criminal proceedings-"(f)irst, the criminal trial historically has been open to the press and general public," and "(s)econd, the right of access to criminal trials plays a particularly significant role in the functioning of the judicial process and the government as a whole," Globe Newspaper, supra, --- U.S. at ----, 102 S.Ct. at 2619-20-apply to voir dire.
 
 
 18
 Under current practice, voir dire is normally conducted in open court. No evidence has been cited that historical practice was to the contrary.
 
 
 19
 There can be no doubt of the importance of public scrutiny of the jury selection process to the effective functioning of the government as well as the judicial system itself. The meticulous care devoted to securing a fair and impartial jury exemplifies the search for even-handed justice characteristic of our system of criminal justice. Public access to the process will heighten public respect for that system. At the same time public scrutiny will encourage those who participate in the jury selection process to enhance the quality of the process and safeguard its integrity.
 
 
 20
 The standard for determining whether a criminal proceeding may be closed to the public and the proper allocation of the burden of making the required showing are not yet clearly settled. Until the Supreme Court resolves these issues, prudence counsels adherence to the strict test stated by Justice Blackmun on behalf of himself and three other Justices in Gannett, supra, 443 U.S. at 440-42, 99 S.Ct. at 2936-37. An accused who seeks closure must establish "that it is strictly and inescapably necessary in order to protect the fair-trial guarantee." This burden may be discharged by demonstrating: (1) "a substantial probability that irreparable damage to his fair-trial right will result from conducting the proceeding in public"; (2) "a substantial probability that alternatives to closure will not protect adequately his right to a fair trial"; and (3) "a substantial probability that closure will be effective in protecting against the perceived harm."
 
 
 21
 Nothing would seem to turn upon the fact that Justice Blackmun's formulation rested on the assumption that the public's right to access arose from the sixth amendment rather than the first amendment. See Sacramento Bee, supra, 656 F.2d at 481-82; Pulitzer Publishing, supra, 635 F.2d at 679-80 (Gibson, J., concurring); United States v. Powers, 622 F.2d 317, 322-23 (8th Cir. 1980).
 
 
 22
 We need not determine whether the closure of the voir dire in the present case met this standard, however, for the court excluded the public and press without satisfying the procedural prerequisites to closure. United States v. Criden, supra, 675 F.2d at 562; Pulitzer Publishing, supra, 635 F.2d at 678-79. There are two procedural prerequisites to entry of an order closing a criminal proceeding to the public: (1) those excluded from the proceeding must be afforded a reasonable opportunity to state their objections; and (2) the reasons supporting closure must be articulated in findings. It is questionable whether the first prerequisite was satisfied; it is clear the second was not.
 
 
 23
 A majority of the Justices in Gannett expressed the view that persons present in the courtroom must be afforded an opportunity to state their objections before exclusion is ordered. 443 U.S. at 401, 445-46, 99 S.Ct. at 2916, 2939; accord Sacramento Bee, 656 F.2d at 482. In Globe Newspaper, supra, --- U.S. at ---- n. 25, 102 S.Ct. at 2622 n. 25, the same Justices joined in stating "(o)f course, for a case-by-case approach (to the necessity for closure) to be meaningful, representatives of the press and general public 'must be given an opportunity to be heard on the question of their exclusion.' " We recognized this as a requirement in Sacramento Bee, supra, 656 F.2d at 482.
 
 
 24
 The Third Circuit has suggested that the statement in Gannett, that persons present in the courtroom are entitled to an opportunity to be heard, contemplates only a motion for closure made in open court, and does not necessarily determine the extent of the notice that is required in other situations. United States v. Criden, supra, 675 F.2d at 559. Closure may be suggested to the trial judge in writing or during an in-chambers conference, id., and may be implemented with no possibility of prior notice to members of the public whose first amendment rights are at stake. This was true in the present case. The record does not disclose how, when, or by whom the initial suggestion for closure of the voir dire was made or when closure was ordered. To afford members of the public an opportunity to intervene and protect this interest, the Third Circuit has required that, where possible, motions requesting closure be docketed a reasonable time before they are acted upon. United States v. Criden, supra, 675 F.2d at 559-60. Without adopting an inflexible rule, we believe that where a closure motion is not filed of record or made in open court, and when, as here, the court has been made aware of the desire of specific members of the public to be present, reasonable steps should be taken to afford such persons an opportunity to submit their views to the court before exclusion is accomplished. In determining what steps are reasonable, a court should avoid any that might result in material delay in the underlying proceedings. Gannett, supra, 433 U.S. at 401, 99 S.Ct. at 2916 (Powell, J., concurring); id. at 446, 99 S.Ct. at 2939 (Blackmun, J., concurring in part and dissenting in part). The record does not demonstrate that any steps to provide notice were taken here.
 
 
 25
 Speaking for himself and three other Justices in Gannett, Justice Blackmun said, "the court should state on the record its findings concerning the need for closure so that a reviewing court may be adequately informed." 443 U.S. at 446, 99 S.Ct. at 2939. Speaking for himself and two other Justices in Richmond Newspapers, Chief Justice Burger wrote, "(a)bsent an overriding interest articulated in findings, the trial of a criminal case must be open to the public." 448 U.S. at 581, 100 S.Ct. at 2830. We recognized the necessity for such findings in Sacramento Bee, supra, 656 F.2d at 482.
 
 
 26
 Failure to articulate reasons for partial closure of voir dire was held to require reversal in Pulitzer Publishing, supra, 635 F.2d at 679. This omission, plus failure to give sufficient notice of closure, led to reversal in United States v. Criden, supra, 675 F.2d at 561-62. See also Revised Report of the Judicial Conference Committee on the Operation of the Jury System on the "Free Press-Fair Trial" Issue, 87 F.R.D. 519, 535 (1980).
 
 
 27
 As the court said in Criden, "(t)he articulation requirement is essential for meaningful appellate review of trial court decisions on motions to hold closed hearings." United States v. Criden, supra, 675 F.2d at 562. Since the purpose of the findings is to enable the appellate court to determine whether the closure order was properly entered, the findings must be sufficiently specific to show that the three substantive prerequisites to closure have been satisfied-that there is a substantial probability (1) that public proceedings would result in irreparable damage to defendant's right to a fair trial, (2) that no alternative to closure would adequately protect this right, and (3) that closure would effectively protect it. The court's findings did not meet this test.
 
 
 28
 General statements that the court concludes closure is necessary from a balancing of first and sixth amendment interests in the light of the presence of "problems of publicity" does not afford a basis for determining whether the court applied the correct standard in weighing possible prejudice from open proceedings or whether the court's conclusion was supported by the record.
 
 
 29
 The only specific reasons stated by the court for separate in camera questioning of each proposed juror were that potential jurors might be influenced by the responses of other jurors if questioned in their presence, and might be less candid if questioned in public. The prejudice suggested by the first reason is unrelated to the presence of the public; it could be avoided simply by keeping other potential jurors out of the courtroom while each was questioned. The second reason, resting on the premise that closure "improves the quality and credibility of testimony ... is speculative," and is, in any event, undercut by the Court's recognition that " '(o)penness in court proceedings may improve the quality of testimony.' " Globe Newspaper, supra, --- U.S. at ---- n. 26, 102 S.Ct. at 2622 n. 26, quoting Gannett, supra, 443 U.S. at 383, 99 S.Ct. at 2907 (emphasis provided by the Globe Court). Moreover, if this general theory of potential prejudice were accepted as sufficient justification for closure without the necessity for finding potential prejudice based upon the circumstances of the particular case, all testimony could be taken in secret.
 
 
 30
 Defendants point to other reasons for closure submitted by defense counsel to the trial court orally and by memoranda. But in the absence of specific findings it is impossible to know whether the court found a substantial probability that an open voir dire would have resulted in irreparable damage to defendants' right to a fair trial for any of these reasons.
 
 
 31
 We are also unable to determine whether the court found no available alternative to closure would have protected defendants' right to a fair trial. Such findings are required. Sacramento Bee, supra, 656 F.2d at 482; United States v. Criden, supra, 675 F.2d at 560-62.
 
 
 32
 So far as the record discloses, the only alternative to closure considered by the district court was sequestration of the jury. Sequestration is an extreme measure, Mastrian v. McManus, 554 F.2d 813, 819 (8th Cir. 1977), and the court explained in considerable detail why sequestration was rejected in this case. But less drastic alternatives were potentially available. The alternatives to closure of the voir dire adopted by Chief Judge Peckham in United States v. Layton, 519 F.Supp. 959 (N.D.Cal.1981), are illustrative. See also Revised Report of Judicial Conference Committee, supra, 87 F.R.D. at 530-31, 532-35. So far as the record discloses, none of these alternatives were considered. No reason for their rejection is suggested in the findings.
 
 
 33
 We add only that although the burden rests upon the proponent of closure to establish that alternatives will not protect defendants' rights to fair trial, it behooves those who resist closure and assert their first amendment right of access to assist in the search for alternatives. Here, as in Sacramento Bee, supra, 656 F.2d at 482, counsel for the media was asked for suggestions, but offered none.
 
 B. Defendant's Motion to Suppress
 
 34
 About July 22, over two months before trial, one of the defendants filed a motion under seal asking the district court to suppress evidence of an oral statement allegedly made by the defendant to FBI agents. An in camera hearing on the motion was set for October 14. On October 10, Blake learned of the filing of the motion and the scheduling of an in camera hearing. On the day set for the in camera hearing, October 14, after the jury had been sworn but before opening statements, attorneys for Times Mirror appeared in open court and presented a motion asking that the hearing on the motion to suppress be held in open court. The motion was denied.
 
 
 35
 In denying the motion for an open hearing the court incorporated by reference its earlier general findings announced in denying the motions to open the voir dire. The court noted the Supreme Court's statement in Richmond Newspapers that the first amendment rights of the public and press are not "absolute." The court noted the restriction on first amendment rights would be limited because only a small portion of the trial would be closed, and transcripts of closed proceedings would be made available after the court had ruled-probably within 24 hours. The only alternative to closure mentioned by the court was sequestration of the jury, and the court noted the disadvantages of sequestration in a lengthy trial. Weighing first and sixth amendment rights, the court concluded, "it seems to me very clear that the Sixth Amendment rights prevail."
 
 
 36
 The court proceeded immediately to hold a closed hearing on the motion to suppress. The motion to suppress was denied.
 
 
 37
 Since the proceeding on the motion began before trial but concluded during trial, this case illustrates the impracticability of attaching dispositive significance to the distinction between trial and pretrial proceedings for the purpose of determining the applicability of the first amendment. Examining the substance, it is clear that the considerations supporting the public's qualified right of access to the criminal trial itself apply as well to hearings on motions to suppress evidence.
 
 
 38
 There is some dispute as to the historical status of public access to such proceedings. Although the Court in Gannett found no persuasive evidence of a public right of access to such proceedings in common law, 443 U.S. at 387, 99 S.Ct. at 2909, it also noted that "pretrial suppression hearings were unknown at common law." Id. at 387 n. 17, 99 S.Ct. at 2909 n. 17. Relying upon the increasing importance of pretrial procedures in the modern era, and the Supreme Court's admonition that the first amendment is to be interpreted in light of current values and conditions, the Third Circuit has concluded that societal interests rather than historical analysis should determine the applicability of the first amendment to such proceedings. United States v. Criden, supra, 675 F.2d at 555.
 
 
 39
 In any event, it seems evident from the opinions in Gannett, Richmond Newspapers, and Globe Newspaper that a majority of the Justices would hold the public's right of access under the first amendment applicable to pretrial suppression hearings. Justice Powell expressed this view explicitly in Gannett. 443 U.S. at 397, 99 S.Ct. at 2914. Justice Blackmun's opinion in Gannett on behalf of himself and Justices Brennan, White and Marshall concluded that the public had a right of access to pretrial suppression hearings under the sixth amendment for essentially the same reasons as led the Court in Richmond Newspapers and Globe Newspaper to hold that the public had a right of access to criminal trials under the First Amendment. Compare Gannett, supra, 443 U.S. at 434-36, 99 S.Ct. at 2933-34, with Richmond Newspapers, supra, 448 U.S. at 569-78, 586-97, 604, 100 S.Ct. at 2823-28, 2833-39, 2842, and Globe Newspaper, supra, --- U.S. at ---- - ----, 102 S.Ct. at 2618-19. Justice Blackmun concluded in Gannett : "(u)nlike almost any other proceeding apart from the trial itself, the suppression hearing implicates all the policies that require that the trial be public." 443 U.S. at 436, 99 S.Ct. at 2934. See also United States v. Criden, supra, 675 F.2d at 556-57; Fenner & Koley, Access to Judicial Proceedings, 16 Harv.C.R.-C.L.L.Rev. 415, 435-38 (1981); Note, Trial Secrecy and the First Amendment Right of Public Access to Judicial Proceedings, 91 Harv.L.Rev. 1899, 1909 (1978). In this instance, for example, the motion to exclude was based upon the claim that government agents breached a promise of confidentiality. "Allegations of this kind, although they may prove to be unfounded, are of importance to the public as well as to the defendant." Gannett, supra, 443 U.S. at 435, 99 S.Ct. at 2934 (Blackmun, J., concurring in part and dissenting in part).
 
 
 40
 There is no question in this circuit of the applicability of the public's first amendment right of access to suppression hearings held during the course of trial. Sacramento Bee, supra, 656 F.2d at 481-82. It would elevate form over substance to deny access to an identical proceeding because it began prior to trial.
 
 
 41
 Blake and Times Mirror had a full opportunity to present their objections to closure of the hearing on the motion to suppress. We note, however, that the motion was submitted under seal and became known publicly only fortuitously, suggesting the need for reasonable steps to make knowledge of the pendency of such motions available.
 
 
 42
 The court's findings supporting closure of the hearing on the motion to suppress suffered the same deficiencies as the findings entered earlier in closing the voir dire : They identified neither the reasons a public hearing would have prejudiced defendants' rights to a fair trial, nor the reasons an alternative to total closure, other than sequestration, would not have protected that interest. Without attempting to catalogue the alternatives, an examination of the transcript indicates "it might well (have been) possible to exclude the public from only those portions of the proceeding at which the prejudicial information would be disclosed, while admitting to other portions where the information the accused seeks to suppress would not be revealed." Gannett, supra, 443 U.S. at 445, 99 S.Ct. at 2939 (Blackmun, J., concurring in part and dissenting in part).
 
 
 43
 C. Defendants' Motion for Access to Tape Recordings
 
 
 44
 Although the record is sketchy, it appears that at some time prior to the initiation of the underlying criminal proceeding an author planning to write a book had interviewed a person who it later developed was to be a government witness in the prosecution. Long prior to trial, defense counsel obtained subpoenas requiring the author to produce tape recordings of interviews between the author and the potential witness. The author moved to quash the subpoena. The district court entered a protective order, the nature of which is not revealed in the record. On October 17, after the taking of testimony in the present case had begun, Mr. Blake was in the courtroom preparing to cover the afternoon proceedings. Members of the press and public were asked to leave. Blake was told by a defense attorney that a defense motion was to be heard in camera.
 
 
 45
 The defense motion, if any, is not in the record. The transcript of the closed hearing reflects that the question considered was whether specific portions of the tapes were relevant to the credibility of the witness and therefore should be made available to defense counsel for cross-examination of the witness, or for submission in evidence. It appears the proceedings were not held in camera at the request of the government or defense counsel, but solely to protect the author's property interest in the tapes.
 
 
 46
 We assume the public's right to access to criminal proceedings may be limited in some circumstances to protect private property interests. See Stamicarbon, N. V. v. American Cyanamid Co., 506 F.2d 532, 539-42 (2d Cir. 1974). See also Richmond Newspapers, supra, 448 U.S. at 600 n. 5, 100 S.Ct. at 2840 n. 5 (Stewart, J., concurring); United States v. Hubbard, 650 F.2d 293, 315 (D.C.Cir.1980). However, a closure to protect a property right must, at the very least, satisfy the same standard and procedural prerequisites as a closure to protect the right to a fair trial. Fenner & Koley, supra, 16 Harv.C.R.-C.L.L.Rev. at 443-44.
 
 
 47
 As we have seen, had this closure resulted from a defense motion based on the fair trial guarantee, a narrow closure would have been appropriate only after an opportunity had been afforded for objection and findings had been entered articulating the irreparable prejudice that would result from open hearings and the absence of alternatives to closure that would protect the interest at stake. Had this closure been mandated by statute, the government would have been required to establish that closure "is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." Globe Newspaper, supra, --- U.S. at ----, 102 S.Ct. at 2620.
 
 
 48
 In this case, no opportunity was afforded to object to the closure, and no findings at all were entered justifying the closure.
 
 D. Motion for Release of Transcripts
 
 49
 On October 21, three weeks after the close of voir dire, one week after the denial of the motion to suppress, four days after the decision on the motion regarding availability of the interview tapes, and while the trial was still in progress, Blake and Times Mirror filed a motion seeking an order releasing the transcripts of the three closed hearings, and requiring that no further hearings be closed until the media were given notice and afforded an opportunity to be heard.
 
 
 50
 After hearing counsel, the court ruled that the transcripts of the closed portion of the voir dire and the transcript of the closed hearing on the motion for access to the tapes would not be released until the trial was completed. The court stated that the motion for release of the transcript of the hearing on the motion to suppress would "become moot" when the defendant's statement was admitted in evidence. Finally, the court held there was no authority establishing a legal right in the media to notice and an opportunity to be heard, but stated that when it was announced the courtroom would be cleared those present would have an opportunity to object and the court would listen to the reasons for the objection.
 
 
 51
 Even where denial of access is appropriate, it must be no greater than necessary to protect the interest justifying it. Globe Newspaper, supra, --- U.S. at ---- - ----, 102 S.Ct. at 2620-23; Sacramento Bee, supra, 656 F.2d at 482, 483. Thus, transcripts of properly closed proceedings must be released when the danger of prejudice has passed. Gannett, supra, 443 U.S. at 393, 99 S.Ct. at 2912; id. at 400, 99 S.Ct. at 2916 (Powell, J., concurring). Indeed, the denial of the motion to release the transcripts was in itself a denial of the right of access protected by the first amendment. It must be tested by the same standard and must satisfy the same procedural prerequisites as the initial closure.
 
 
 52
 Petitioners were afforded sufficient opportunity to present their reasons for unsealing the transcripts, but the court's findings were not sufficient to demonstrate the court made the determinations necessary to justify denial of access to the transcripts.
 
 
 53
 The court at first stated it intended to open the transcript of the closed portion of the voir dire. Defense counsel argued there was no newsworthy purpose in reporting reactions of particular jurors to questions posed by counsel, and that release of the transcript "is only going to cause them to be contacted by families, friends, exposing them to some pressure, at least the possibility exists." The court properly rejected counsel's suggestion that closure could be based on the court's judgment as to the newsworthiness of the information contained in the transcript, but continued, "I understand what you are saying with regard to the possibility of influence on these jurors, through family members and others, who might indeed read some of these news accounts at this time." The court concluded, "I think it might be more advisable, in terms of protecting the rights of these defendants, not to release it at this time, but to wait and release it after the trial has ended."
 
 
 54
 The only prejudice from opening the transcript of the voir dire identified by the court was possible pressure upon jurors from family and friends based upon news accounts of the jurors' responses during voir dire. It is not at all clear from examining the transcript itself what "pressure" the court feared. Moreover, counsel in advancing the argument and the court in adopting it stated only that there was a "possibility" of such pressure: There was no finding that the danger was sufficient to create a "substantial probability" that defendants' rights to a fair trial might be compromised. Nor did the court find a substantial probability that alternatives to continuing closure would not adequately protect defendants' rights. Only sequestration was mentioned and rejected as an alternative, though admonitory instructions to the jurors or voluntary agreement by the media as to scope and timing of coverage seem obvious candidates. Sacramento Bee, supra, 656 F.2d at 482-83.
 
 
 55
 With respect to the transcript of the suppression hearing, the court noted it had denied the motion to suppress defendant's statement and said, "I don't think that in fairness to these defendants it ought to be released before indeed the jury itself gets to hear the testimony." The question was not whether the defendant's inculpatory statement should be disclosed, but rather whether the transcript of the hearing on the motion to suppress evidence of that statement should have been unsealed. The two are not the same. As we have noted, much of the transcript of the suppression hearing could have been made available without disclosing the contents of defendant's statement. At the least, a statement of the reasons for rejecting this and other possible alternatives to complete denial of the motion for access to the transcripts-disclosure accompanied by admonitory instructions to the jury, for example, or a voluntary agreement to the media to limit publicity-should have been articulated in findings.
 
 
 56
 Finally, with respect to the transcript of the hearing regarding access to the interview tapes, the court noted that it was only attempting to protect the owner of the tapes, and suggested the media consult with the owner and his counsel regarding access to them. But again, access to the transcripts was at issue, not access to the tapes, and it was the court and not the tape owner that denied petitioners access to the transcript. Even if the content of the transcript could not be disclosed without also disclosing the content of the tapes, the court could not absolve itself of the obligation to recognize the public's first amendment right to access to the transcript by delegating the authority to resolve that issue to the owner of the tapes. It was the court's duty to satisfy the procedural prerequisites, weigh the conflicting interests, and decide whether and to what extent petitioners' first amendment rights must be subordinated to the owner's property interest.
 
 
 57
 In view of the authorities discussed earlier, the district court also erred in concluding petitioners had no legal right to an opportunity to be heard before exclusion was ordered. Petitioners also had a legal right to notice, but only to the extent we have indicated earlier.
 
 IV.
 
 58
 Although we conclude the district court erred in the respects indicated, it does not follow that mandamus should issue. When the district court ruled, the Richmond Newspapers opinion had just been filed, and the opinion in Globe Newspaper as well as those in such court of appeals cases as Pulitzer Publishing, Criden, and Sacramento Bee were as yet unwritten. When the district court ruled, the errors we now perceive were far from clear. We have no doubt the district court will act in accordance with the guidelines stated in this opinion and that a writ is unnecessary. Cf. Sacramento Bee, supra, 656 F.2d at 483; Arthur Young & Co. v. United States District Court, 549 F.3d 686, 692 (9th Cir. 1977). Moreover, although the controversy is not moot under controlling authority, in view of the completion of the trial and the release of the transcripts, issuance of a writ would be an empty gesture.
 
 
 59
 The appeal is dismissed, and the petition for writ of mandamus is denied. Each party shall bear its own costs.