483 So.2d 651 (1986)
STATE of Louisiana, Plaintiff-Respondent,
v.
Winthrop Earl EATON, Defendant-Respondent,
News Star World Publishing Corporation d/b/a Monroe News Star World, Intervenor-Applicant.
No. 17742-KW.
Court of Appeal of Louisiana, Second Circuit.
January 22, 1986.
*652 Hudson, Potts & Bernstein by W. Craig Henry, Monroe, for intervenor-applicant.
Cooper, Hales & Aycock by Geary S. Aycock, Decelle & Holland by Malcolm Decelle, Jr., West Monroe, for defendant-respondent.
William J. Guste, Jr., Atty. Gen., Barbara B. Rutledge, Asst. Atty. Gen., James Allan Norris, Jr., Dist. Atty., Michael J. Fontenot, Asst. Dist. Atty., Monroe, for plaintiff-respondent.
Before HALL, C.J., and MARVIN and LINDSAY, JJ.
HALL, Chief Judge.
We granted the application of the Monroe News Star World to determine whether the trial court erred in closing and subsequently denying access to a transcript of a hearing to determine the mental capacity to proceed of the defendant, Winthrop Earl Eaton, who is accused of first degree murder in violation of LSA-R.S. 14:30. We here consider whether the First Amendment to the United States Constitution and Article 1, Section 7 of the Louisiana Constitution of 1974 accords the public and press the right of access to attend a pretrial hearing when the defendant, in order to protect his right to a fair trial, requests that the hearing be closed. Concluding that there is a qualified constitutional right of access, we also consider the criteria for closure of a pretrial hearing and the applicability of the criteria to the instant case. Our decision in this case is that the hearing should not have been closed and that the transcript of the hearing should be made available to the public and the press.
FACTUAL AND PROCEDURAL BACKGROUND
On the morning of March 12, 1985, Reverend Lea Joyner, the 67 year old female pastor at Southside United Methodist Church in Monroe, was discovered missing by a member of the church who routinely gave Reverend Joyner a morning wake-up call. Reverend Joyner helped establish the Southside United Methodist Church 32 years ago and had been the congregation's only pastor.
At approximately 8:30 that morning church members contacted the Monroe Police Department and a search subsequently began for Reverend Joyner. The church was found locked but Reverend Joyner's broken eye-glasses and a pool of blood were found outside the church. Reverend Joyner's car, a white 1985 Honda Accord, was also discovered missing. A bulletin asking all law enforcement agencies to be on the lookout for the missing vehicle was sent by the Monroe Police Department.
The first report in the Monroe News Star World, on the front page, occurred on Wednesday, March 13 which headlined "Massive Search Underway for Pastor." The newspaper articles recounted the incidents of the previous day and also profiled the life of Reverend Joyner.
On the same Wednesday morning the stabbed and battered body of Reverend Joyner was found in a cotton field near Black Bayou, north of Monroe in Ouachita *653 Parish. That same day the defendant, Winthrop Earl Eaton, and Reverend Joyner's missing car were found in Little Rock, Arkansas at the home of Eaton's aunt and uncle. Eaton was arrested in Little Rock and transferred to the Ouachita Parish jail on Wednesday afternoon on a charge of first degree murder.
On Thursday, March 14, the newspaper again carried the incidents of the previous day on the front page of the newspaper. The article described Eaton and his family and also contained a picture of Eaton being escorted by police officers in Little Rock. The funeral services for Reverend Joyner scheduled for the following Sunday were also reported on the front page of the newspaper.
On Friday, March 15, the newspaper carried an article describing Eaton's previous arrest record and also carried Eaton's picture on the front page. Another article concerned speculation about who would replace Reverend Joyner at the Southside United Methodist Church.
On Saturday, March 16, the newspaper carried another front page article describing Eaton's appearance before the Fourth Judicial District Court on Friday, and another article concerning the mourners of Reverend Joyner.
On Sunday, March 17, more than 3,000 people attended funeral services for Reverend Joyner at the Monroe Civic Center. The newspaper carried an article concerning the fact that Ex-Governor John McKeithen and Reverend Joyner grew up together in Caldwell Parish.
The following Monday, the newspaper described and carried pictures of the funeral of Reverend Joyner and also carried an article concerning admissions of guilt made by Eaton. Both stories appeared on the front page of the newspaper.
Newspaper accounts concerning Reverend Joyner and Eaton appeared periodically after the funeral. On March 26, the newspaper carried an article on page 4-B concerning Eaton's failure to obtain a lawyer. On March 29, the newspaper carried another front page article concerning the appointment of new counsel to represent Eaton.
On Thursday, April 18, a Ouachita Parish Grand Jury indicted the defendant for first degree murder. On the following day, the newspaper carried an article concerning Eaton's indictment. In the following months, the newspaper carried several articles concerning a book on Reverend Joyner's life, the naming of a bridge and an expressway after Reverend Joyner, and Reverend Joyner's replacement at Southside United Methodist Church, Reverend Joe Solomon.
On April 19, 1985, defendant's counsel applied for the appointment of a sanity commission to examine the defendant and to report on his present mental condition, his mental condition at the time of the alleged offense, and requested a hearing concerning defendant's present capacity to proceed. On April 22, defendant was formally arraigned and pled not guilty and not guilty by reason of insanity. On Wednesday, May 15, defense counsel and the state appeared before the district court concerning defendant's application for appointment of a sanity commission. The court indicated that it would rule on defendant's motion on the following day.
On May 16, the Monroe News Star World carried an article indicating that the district court was expected to make a ruling on defendant's motion for appointment of a sanity commission. On that same day the court granted defendant's motion and appointed Dr. Norman Mauroner and Dr. Patricia N. Stockhart of Shreveport to inquire into defendant's mental condition. On the next day, May 17, the newspaper reported the appointment of the sanity commission.
On June 27, the newspaper reported the findings of Dr. Stockhart. The article headlined "Psychiatrist: Tests Show Eaton Sane."
On Tuesday, July 9, the mental capacity hearing was held in the district court. Prior to the hearing, defense counsel filed a written motion requesting that the hearing *654 be closed to members of the public and the press. The state indicated that it had no objection to the closure of the hearing. The trial court granted defendant's motion and closed the courtroom to the public and the press. Liz Craft, a reporter for the Monroe News Star World who was present in the courtroom, left the courtroom and obtained the assistance of an attorney. While the hearing was still in progress, the attorney sent a note into the court requesting that the court hear the newspaper's objection to the closure; however, the court refused to hear the newspaper's attorney. At the conclusion of the hearing, the trial court ruled that defendant had the mental capacity to proceed. The trial court then allowed counsel for the newspaper to object to the closure and to the court's failure to stay the hearing until counsel for the newspaper could be heard. Counsel requested that the court stay any action in the proceedings until the newspaper could seek review in this court concerning the closure. The court denied counsel's request.
In the newspaper's first application to this court for supervisory review, we held that the issue of the correctness of the trial court's order closing the mental capacity hearing was moot; however, this court directed the trial court to hold a hearing to determine whether the newspaper was entitled to the transcript of the hearing or any part of it. After the hearing the trial court found a reasonable likelihood of substantial prejudice to the defendant's right to a fair trial should any portion of the transcript be provided to the newspaper. The trial court thus denied the newspaper's request for a transcript. It is from this ruling that the Monroe News Star World now seeks this court's supervisory review.
The present writ application presents three issues for resolution by this court: (1) whether there is a First Amendment right of access by the public and press to pretrial criminal proceedings; (2) if such a right exists, what procedure and criteria should trial courts follow in balancing and protecting the rights of the public, press, state, and the defendant; and (3) whether the trial court erred under the applicable jurisprudence in closing the mental capacity hearing and in denying the applicant a copy of the transcript of those proceedings.
PRETRIAL RIGHT OF ACCESS
The first issue for resolution is the question of whether the public and press have a right to attend pretrial criminal proceedings under the First Amendment to the United States Constitution and Article 1, Section 7 of the Louisiana Constitution of 1974.
Defendant contends that the public and press do not have an enforceable right to be present at a pretrial hearing. Defendant contends that the Sixth Amendment's guarantee of a right to a public and fair trial is personal to the defendant and that when the defendant, the state, and the court have determined that the closure of a hearing is necessary to protect the defendant's right to a fair trial, the public and press have no independent right to compel the opening of the proceeding under the First Amendment.
The applicant contends that the public and press have an enforceable right of access to pretrial and trial proceedings under the First Amendment to the United States Constitution. Thus, each party has asserted a competing constitutional right to the exclusion of the other party's right.
The Sixth Amendment to the United States Constitution provides:
In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.
Similarly, Article 1, Section 16 of the Louisiana Constitution of 1974 provides:

*655 Every person charged with a crime is presumed innocent until proven guilty and is entitled to a speedy, public, and impartial trial in the parish where the offense or an element of the offense occurred, unless venue is changed in accordance with law. No person shall be compelled to give evidence against himself. An accused is entitled to confront and cross-examine the witnesses against him, to compel the attendance of witnesses, to present a defense, and to testify in his own behalf.
The First Amendment to the United States Constitution provides:
Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.
Similarly, Article 1, Section 7 of the Louisiana Constitution of 1974 provides:
No law shall curtail or restrain the freedom of speech or of the press. Every person may speak, write, and publish his sentiments on any subject, but is responsible for abuse of that freedom.
In Gannett Co. v. DePasquale, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979) the United States Supreme Court held that the public has no right under the Sixth Amendment to attend pretrial proceedings in a criminal action. In Gannett, the trial judge in a state homicide case granted defendant's motion to exclude the press and public from a pretrial suppression hearing because an "unabated build up of adverse publicity had jeopardized the ability of the defendants to receive a fair trial." The New York Court of Appeals affirmed the closure order. The Supreme Court affirmed, concluding that the Sixth Amendment guarantee of a public trial in all criminal prosecutions is personal to the accused and does not accord the public an independent right to attend a trial. Justice Stewart's plurality opinion found that although the public has a valid and traditional interest in open judicial proceedings, this interest is adequately protected by the parties to the litigation. 99 S.Ct. 2898 at 2907. The Supreme Court specifically reserved and did not decide the question of whether a public right of access is lodged in the First and Fourteenth Amendments but stated that even if such a right does exist, the trial court had given it appropriate deference.
There were three concurrences and four dissents in Gannett. Justice Powell's concurrence and Justice Blackmun's dissenting opinion, in which three other Justices joined, both asserted that the public has a constitutionally protected right of access to criminal proceedings. Justice Powell found that the First Amendment guarantees the public's right to attend criminal trials whereas Justice Blackmun found this right in the Sixth Amendment. Thus, five members of the Supreme Court in Gannett agreed that the public has a constitutionally protected right to attend all criminal trials and pretrial hearings and all five agreed that this right is not absolute, but rather must be balanced against the defendant's right to a fair trial.
In State v. Birdsong, 422 So.2d 1135 (La.1982), the Louisiana Supreme Court also addressed the issue of whether the public and press could be excluded from a pretrial suppression hearing. In Birdsong, the defendant was charged with the first degree murder and robbery of a Pizza Hut Restaurant employee in Shreveport. Defense counsel filed a motion to suppress a confession made by the defendant and moved to close the suppression hearing. The trial court denied defendant's motion. However, relying on Gannett v. DePasquale, supra, the Supreme Court reversed the trial court and granted defendant's motion to close the hearing to the public and press. The Birdsong court held that neither the public nor the press have an enforceable right of access to a pretrial suppression hearing.
In Richmond Newspapers v. Virginia, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), the United States Supreme Court held that the First Amendment guarantees *656 the public and the press the right to attend criminal trials unless it is demonstrated that some curtailment of that right is required to protect defendant's superior right to a fair trial or that some other overriding consideration requires closure. Although there was no majority opinion of the court in Richmond Newspapers, several members of the Court agreed that the First Amendment assures some right of access to some governmental proceedings. The opinions of each Justice writing separately provide guidance in the determination of whether the right of access to a trial applies to a pretrial hearing.
Each Justice in Richmond Newspapers relied on the argument that trials had traditionally been open to the public and four of the Justices additionally relied upon a functional argument that a First Amendment right of access to governmental activities arises whenever public observation serves important public purposes. Justice Powell, who did not participate in the decision of Richmond Newspapers, had previously determined in his concurring opinion in Gannett that the public and press had a First Amendment right of access in a pretrial suppression hearing. In Gannett, Justice Powell found that the members of the press act as agents for each member of the public at large in obtaining "the information needed for the intelligent discharge of his political responsibilities." 99 S.Ct. at 2914-15.
Chief Justice Burger, writing the plurality opinion joined by Justices White and Stevens in Richmond Newspapers, found open court proceedings to be mandated by at least six societal interests. First, when a criminal trial is conducted in the open, there is an opportunity for public understanding of the system in general and its workings in a particular case. Thus, public access and the knowledge gained thereby serve an important, "educational" interest. 100 S.Ct. at 2825. Second, public access to criminal proceedings gives "the assurance that the proceedings were conducted fairly to all concerned" and promotes the public "perception of fairness." 100 S.Ct. at 2823, 2824. Third, public access to criminal proceedings has a "significant community therapeutic value" because it provides an "outlet for community concern, hostility, and emotion." 100 S.Ct. at 2824. Fourth, public access to criminal proceedings serves as a check on corrupt practices by exposing the judicial process to public scrutiny, thus discouraging decisions based on secret bias or partiality. 100 S.Ct. at 2823. Fifth, public access to criminal proceedings enhances the performance of all involved. 100 S.Ct. 2823. And sixth, public access to criminal proceedings discourages perjury. 100 S.Ct. at 2828.
Justice Brennan, concurring, joined by Justice Marshall, in Richmond Newspapers found that public access is essential if trial adjudication is to achieve the objective of maintaining public confidence in the administration of justice. 100 S.Ct. at 2837. Similarly to Chief Justice Burger's opinion, Justice Brennan found that contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power, that public trial proceedings aid true and accurate fact finding, and that popular attendance at trials substantially furthers the particular public purposes of critical judicial proceedings. 100 S.Ct. at 2838.
Justice Blackmun, concurring in Richmond Newspapers, found that the public has an intense need and a deserved right to know about the administration of justice in general and about the prosecution of local crimes in particular. 100 S.Ct. at 2842.
In sum, six Justices of the United States Supreme Court have concluded that the public and the press have a protected First Amendment right of access due to the longstanding tradition of open criminal proceedings and the important governmental interests of the public in observing the administration of justice in each case.
In Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982), the Supreme Court again recognized a constitutional right of access by the public to attend criminal trials under the First Amendment. After discussing *657 the historical tradition of open criminal proceedings, the court in Globe stated at 102 S.Ct. 2619 that:
... the right of access to criminal trials plays a particularly significant role in the functioning of the judicial process and the government as a whole. Public scrutiny of a criminal trial enhances the quality and safeguards the integrity of the factfinding process, with benefits to both the defendant and to society as a whole. Moreover, public access to the criminal trial rosters an appearance of fairness, thereby heightening public respect for the judicial process. And in the broadest terms, public access to criminal trials permits the public to participate in and serve as a check upon the judicial processan essential component of our structure of self-government. In sum, the institutional value of the criminal trial is recognized in both logic and experience.
In Press Enterprise Co. v. Superior Court, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984), the Supreme Court extended the right of access established in Richmond Newspapers not only to the trial but also to the voir dire proceedings. In Press Enterprise, 104 S.Ct. at 823, the court stated:
For present purposes, how we allocate the `right' to openness as between the accused and the public, or whether we view it as a component inherent in the system benefiting both, is not crucial. No right ranks higher than the right of the accused to a fair trial. But the primacy of the accused's right is difficult to separate from the right of everyone in the community to attend the voir dire which promotes fairness.
The open trial thus plays as important a role in the administration of justice today as it did for centuries before our separation from England. The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness can be observed; the sure knowledge that anyone is free to attend gives-assurance that established procedures are being followed and that deviations will become known. Openness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system. Richmond Newspapers, Inc. v. Virginia, 448 U.S., at 569-571, 100 S.Ct., at 2823-2824.
In Waller v. Georgia, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) the Supreme Court summarized the recent opinions of the court in right of access cases. The court found:
... In several recent cases, the Court found that the press and public have a qualified First Amendment right to attend a criminal trial. Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). We also have extended that right not only to the trial as such but also to the voir dire proceeding in which the jury is selected. Press-Enterprise Co. v. Superior Court, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984). Moreover, in an earlier case in this line, Gannett Co. v. DePasquale, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979), we considered whether this right extends to a pretrial suppression hearing. While the Court's opinion did not reach the question, ed., at 392, 99 S.Ct., at 2911, a majority of the Justices concluded that the public had a qualified constitutional right to attend such hearings, id., at 397, 99 S.Ct. at 2914 (POWELL, J., concurring) (basing right on First Amendment); id., at 406, 99 S.Ct., at 2919 (BLACKMUN, J., joined by BRENNAN, WHITE, and MARSHALL, JJ., dissenting in part) (basing right on Sixth Amendment).
After Gannett and Richmond Newspapers were decided, the Second, Third, Fifth, and Ninth Circuits of the United States Courts of Appeals recognized a First Amendment right of access by the public and press to attend pretrial hearings. Application of the Herald Co., 734 F.2d 93 *658 (2d Cir., 1984); United States v. Criden, 675 F.2d 550 (3d Cir., 1982); United States v. Chagra, 701 F.2d 354 (5th Cir., 1983); United States v. Brooklier, 685 F.2d 1162 (9th Cir., 1982).
United States v. Criden, supra, and United States v. Brooklier, supra, concerned pretrial hearings on motions to suppress evidence. In each of these cases the Third and Ninth Circuits noted that suppression hearings often involve questions of great public concern, such as the propriety of police conduct, and therefore awaken the same reasons for public access as the trial itself.
In Application of the Herald Co., supra, the Second Circuit found that the public and press have a First Amendment right of access to attend a pretrial hearing of a motion to suppress made by a defendant. The Second Circuit found that the increasing reliance by a majority of the Justices of the U.S. Supreme Court upon the functional, governmental interest analysis strongly suggests some degree of First Amendment access to pretrial proceedings. Further, the court held that if the First Amendment protects the public from abridgment of a right of access to information about government, including the judicial branch, the conduct of pretrial proceedings surely constitutes an important segment of that information. The court found that "it makes little sense to recognize a right of public access to criminal courts and then limit that right to the trial phase of a criminal proceeding, something that occurs in only a small fraction of criminal cases. There is a significant benefit to be gained from public observation of many aspects of a criminal proceeding, including pretrial suppression hearings that may have a decisive effect upon the outcome of a prosecution."
In United States v. Chagra, supra, the Fifth Circuit determined that the public and press have a First Amendment right of access to a pretrial bail hearing. The Fifth Circuit found that the First Amendment right of access is, in part, founded on societal interest and public awareness of, and its understanding and confidence in, the judicial system. Moreover, the court found that public access is a check on judicial conduct and tends to improve the performance of both the parties and the judiciary and that these interests are as affected by proceedings to determine conditions of pretrial release as they are by other judicial proceedings.
In Louisiana, the mental capacity hearing is ordinarily a hearing which is open to the public. Under LSA-C.Cr.P. Art. 647, "The issue of the defendant's mental capacity to proceed shall be determined by the court in a contradictory hearing. The report of the sanity commission is admissible in evidence at the hearing, and members of the sanity commission may be called as witnesses by the court, the defense, or the district attorney. Regardless of who calls them as witnesses, the members of the commission are subject to cross examination by the defense, by the district attorney, and by the court. Other evidence pertaining to the defendant's mental capacity to proceed may be introduced at the hearing by the defense or by the district attorney." As provided by LSA-C. Cr.P. Art. 648, if the court determines that the defendant has the mental capacity to proceed, the criminal prosecution shall be resumed. But if the court determines that the defendant lacks mental capacity to proceed, the proceedings shall be suspended and the defendant shall be committed to the custody of the Department of Health and Human Resources or a private institution. Thus, the hearing to determine the defendant's mental capacity to proceed is a critical stage of the prosecution. The determination of the defendant's mental capacity to proceed requires decisions by the court that attract significant public interest and invite legitimate and healthy public scrutiny.
Due to the longstanding tradition of open criminal proceedings and the strong societal interest by the public in the administration of justice and in light of the jurisprudence which has developed since Gannett and Birdsong, we hold that the public *659 and press have an enforceable right of access to attend pretrial criminal proceedings under the First Amendment to the United States Constitution and Article 1, Section 7 of the Louisiana Constitution of 1974. This right is, however, qualified and not absolute. As the Fifth Circuit stated in United States v. Chagra, supra:
Recognition of a right of access by the public and the press does not obliterate the differences between trial and pretrial, nor does it fix the judicial scales against closure beyond counterweight. Despite the categorical language in the first amendment, the rights it safeguards are not absolute. Like the freedom to speak, the freedom to publish, the freedom to exhibit movies, and other firstamendment-protected rights, the right of courtroom access is limited by the constitutional right of defendants to a fair trial, and by the needs of government to obtain just convictions and to preserve the confidentiality of sensitive information and the identity of informants.
* * * * * *
There is no single divine constitutional right to whose reign all others are subject. When one constitutional right cannot be protected to the ultimate degree without violating another, the trial judge must find the course that will recognize and protect each in just measure, forfeiting neither, and permitting neither to dominate the other. The public enjoys a First Amendment right of access to pretrial... hearings. That right, however, must accommodate other constitutional rights.
PROCEDURAL PREREQUISITES TO CLOSURE
Having determined that the public and press enjoy the right of access to pretrial proceedings, we must now determine what criteria a trial court should follow in balancing and protecting the rights of the public and the press, and the right of the defendant to receive a fair trial. That there is a First Amendment right of access to pretrial criminal proceedings is not determinative of whether the newspaper had a right of access to the proceedings in this case.
In Press-Enterprise Co. v. Superior Court, supra, 104 S.Ct. at 824, the Supreme Court held:
The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.
The United States Supreme Court has not set forth what interests and circumstances would be sufficiently overriding to require closure. Two justices have suggested different standards for weighing the defendant's fair trial rights against the public's right to access. Justice Blackmun's dissenting opinion in Gannett suggested that a defendant seeking closure of a pretrial suppression hearing must establish that "it is strictly and inescapably necessary in order to protect his fair trial guarantee," 99 S.Ct. at 2936. Under this view, the defendant must, at a minimum, establish that: (1) there is substantial probability that irreparable damage to his fair trial right will result from opening the proceeding; (2) alternatives to closure cannot adequately protect his fair trial rights; and (3) there is a substantial probability that closure will be effective in protecting against a perceived harm. 99 S.Ct. at 2937.
Justice Powell proposed a similar test, but required the defendant only "make some showing that the fairness of his trial likely will be prejudiced by public access to the proceedings." 99 S.Ct. at 2916.
The Judicial Conference of the United States, the United States Department of Justice, and the United States Fifth Circuit Court of Appeals have approved the less stringent standard proposed by Justice Powell. See 87 F.R.D. 519, 535 (1980); 28 C.F.R. § 50.9 (1982) and United States v. Chagra, supra. Under this standard a defendant *660 seeking closure of a pretrial hearing overcomes the First Amendment right of access to that hearing if he shows that:
(1) His right to a fair trial will likely be prejudiced by conducting the hearing publicly;
(2) Alternatives to closure cannot adequately protect his fair trial right; and
(3) Closure will probably be effective in protecting against the perceived danger.
In State v. Birdsong, supra, the Louisiana Supreme Court held that a defendant "should only have to show a reasonable likelihood of substantial prejudice to his right to a fair trial...." See also State v. Prestridge, 457 So.2d 1203 (La.App. 3d Cir., 1984).
We find the standards set forth in United States v. Chagra, to be the appropriate criteria to follow in determining whether closure is necessary. The first requirement protects the defendant's constitutional right to a fair trial. This rule should not be interpreted to mean that publicity will necessarily equal prejudice. Under this criterion, a showing should be made that inadmissible, prejudicial information will come out at the hearing that will likely infringe upon the defendant's right to a fair trial.
The second criterion protects the First Amendment rights of the public and press by requiring that the court examine alternatives to closure. As Justice Lemmon stated in his concurring opinion in State v. Birdsong, 425 So.2d 1266:
Before granting a defense motion to close a pretrial hearing, the judge should consider alternative means of eliminating or minimizing prejudicial effects, and the record should reflect the judge's reasons for determining that closing the hearing is the only reasonable method. See United States v. Criden, 675 F.2d 550 (3d Cir., 1982). The judge should at least explore the option of using such alternatives as continuance, change of venue, individual voir dire of jurors (out of the presence of other prospective jurors), and other such means (including voluntary cooperation of the media in agreeing not to disclose details) to avoid the prejudicial effect of pretrial publicity.
In making the decision respecting closure, the judge should also consider such factors as the nature of the crime (certainly the fact that defendant is exposed to the death penalty is very important), the amount of publicity generated by the commission of the offense and the arrest of the offender, the nature of the issues being considered at the pretrial hearing, and the probable length of time between the pretrial hearing and the trial on the merits. See United States v. Criden, above; Smith v. District Court, [201 Mont. 376] 654 P.2d 982 (Mont.1982), 32 Crim.L.Rep. 2295.
The third criterion takes a practical approach to the problem of whether the closure will be effective in protecting against the perceived prejudice. If the information which will come out at the hearing is already known by the public and press, the closure of the hearing would not be effective in eliminating the prejudicial publicity.
In attempting to balance the right of the public and the right of the defendant to a fair trial, the court should, before entry of an order of closure, require the moving party to make a showing under the criteria set forth by this court and afford those present in the courtroom a reasonable opportunity to state their objections to the closure. Secondly, the court should articulate for the record, and for the appellate court on review, its findings supporting closure. In establishing the basis for an order of closure, the court should take whatever steps are necessary to prevent the release of information or evidence which forms the basis of the motion for a closed hearing.

APPLICABILITY OF THE LAW AND CRITERIA TO THE PRESENT CASE
We must now determine whether adequate reasons supporting closure of the hearing and refusal to release the transcript are present in this case. Although the closure issue is moot in the sense that *661 the hearing has been concluded, courts have frequently considered the closure issue under such circumstances because the issue is repetitive and otherwise evades appellate review. In this case, determination of the yet viable issue of whether the transcript of the hearing should be released overlaps with consideration of whether the hearing should have been closed initially.
The motion for closure was filed immediately prior to the mental capacity hearing and was considered then. The court probed the lawyers who called attention to the extensive publicity and represented that the sanity commission psychiatrists would testify as to interviews with the defendant and particularly statements concerning the facts of the alleged offense. The court questioned the doctors who indicated that they did not intend to discuss anything said about the offense. The court ordered closure in view of the state's position supporting closure without otherwise articulating reasons for closure.
The newspaper's subsequent writ application was denied, but with directions to the trial court to hold a hearing to determine whether the transcript or parts thereof should be released. At the conclusion of the hearing held pursuant to this court's order to determine whether the transcript should be released, the trial court issued a written per curiam stating reasons for not releasing the transcript. Finding a reasonable likelihood of substantial prejudice to the defendant's right to a fair trial, the court noted the extensive news media coverage of the case. The court found that although the issue at the hearing was the defendant's capacity to proceed, much of the testimony of the psychiatrists was relevant to the issue of insanity at the time of the offense and the public does not readily distinguish the difference between the two issues. Publication of the testimony would impact upon the public's impression of the defendant's mental condition not only presently but at the time of the offense and would weaken his main defense in the eyes of the public. Also, publication of some of the statements which defendant made to the doctors might be prejudicial to his right to a fair trial. The court recognized the right of the press to access to criminal trials, but also recognized the court's affirmative duty to minimize the effects of prejudicial publicity and to take necessary protective measures, citing Gannett.
Applying the criteria set forth earlier in this opinion, we first must determine whether the defendant's right to a fair trial would likely have been prejudiced by conducting the hearing publicly or by now releasing the transcript of the hearing.
The murder and subsequent criminal proceedings have received significant coverage in the Monroe News Star World, and, we assume, in other media although no showing was made in that regard. However, a large part of the coverage occurred in the first week after the murder and only sporadically thereafter as events occurred in the prosecution. Publicity in and of itself does not necessarily prejudice a defendant's right to a fair trial. The showing made at the hearing on whether to grant closure did not indicate specific testimony which could be expected to prejudice potential jurors to be selected at an undetermined time in the future when the case might be tried. The transcript of the mental capacity hearing reveals no particularly prejudicial statements or facts related by the physician witnesses likely to influence potential jurors. Neither testified as to any statements or facts related to the commission of the alleged offense.
The perceived prejudice resulting from an inability of the public to distinguish between the issues of mental capacity to proceed and insanity at the time of the offense is tenuous. The testimony of the witnesses was clearly directed at the former issue and not the latter. In any event, the decision of the trial court that the defendant has the mental capacity to proceed is a matter of public record and the public is necessarily aware of that decision.
We conclude that the trial court erred in finding that the defendant's right to a fair trial would likely be prejudiced by conducting the hearing publicly or by releasing the *662 transcript. Admittedly, closure was a close call by the trial court prior to the hearing based on the representations of what the testimony might disclose, and our conclusion is based somewhat on hindsight and with the transcript of the hearing available for review.
Secondly, we must determine whether there existed reasonable alternatives to closure and release of the transcript that would adequately protect the defendant's right to a fair trial. The record does not reflect that the trial court considered any alternatives other than closure. As suggested by Justice Lemmon in Birdsong, continuance, change of venue, and individual voir dire of the jurors at trial might be reasonable alternatives in an effort to avoid the prejudicial effect of pretrial publicity. These and other alternatives were and still are available.
Third, we must consider whether closure and refusal to make the transcript available will be effective in protecting against the perceived prejudice. The court record contains the reports of both psychiatrists who testified at the mental capacity hearing, which reports were apparently filed into the public record prior to the hearing. The June 27 edition of the Monroe News Star World contained an article on the report of one of the psychiatrists. The information in the article and the testimony adduced at the hearing are substantially the same.
The public and potential jurors are aware that the defendant was found competent to proceed by the ruling of the court at the conclusion of the hearing.
Closure of the hearing and denial of access to the transcript will have little effect in avoiding the alleged prejudicial publicity in light of the fact that most of the information concerning the hearing is already public.
CONCLUSION AND DECREE
Considering the three criteria as applied to this case, we find that the trial court erred in closing the mental capacity hearing to the public and press and in refusing to allow access to the transcript of the hearing. The judgment of the district court denying the applicant, Monroe News Star World, a copy of the transcript of the mental capacity hearing is reversed. The Clerk of the Fourth Judicial District Court is ordered to unseal the transcript and the district court's per curiam and file same in the record of this proceeding as a matter of public record. The transcript and the per curiam shall, however, remain sealed until the judgment of this court becomes final.
REVERSED AND RENDERED.