**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| IN RE UNITED STATES OF AMERICA, | No. 14-70486 |
| UNITED STATES OF AMERICA, *Petitioner*, | D.C. No. 3:13-cv-00470-RCJ-VPC |
| v. | |
| UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEVADA, RENO, *Respondent*, | OPINION |
| PAUL J. MALIKOWSKI; BANK OF AMERICA, NA, *Real Parties in Interest*. | |

On Petition for Writ of Mandamus
to the United States District Court
for the District of Nevada
Robert Clive Jones, District Judge, Presiding

Argued January 16, 2015
Submitted June 29, 2015
San Francisco, California

Filed June 29, 2015

Before: J. Clifford Wallace, Milan D. Smith, Jr.,
and Michelle T. Friedland, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.;
Concurrence by Judge Wallace

## SUMMARY[*]

### Mandamus

The panel denied without prejudice a petition for a writ of mandamus brought by the United States challenging District Judge Robert C. Jones's policy of denying the applications for pro hac vice admission of U.S. Department of Justice attorneys who are not admitted to the Nevada Bar.

After the United States filed its petition for a writ of mandamus, Judge Jones reversed his previous order denying the United States attorney permission to appear. The panel held that this did not render the controversy moot because the challenged conduct can reasonably be expected to recur. The panel held that the controversy remains live, and the court had jurisdiction to consider the petition.

The panel held that while the reversal of the challenged order did not render the controversy moot, it rendered a formal writ of mandamus a superfluous or ineffective remedy. The panel further held that the court was not categorically precluded from opining on the merits of the

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

mandamus petition when issuance of the writ would no longer be effective.

The panel considered whether mandamus relief would have been appropriate at the time the petition was filed, and applied the five factors enumerated in *Bauman v. U.S. District Court*, 557 F.2d 650, 654-55 (9th Cir. 1977). The panel held that at a minimum, a court's decision to deny pro hac vice admission must be based on criteria reasonably related to promoting the orderly administration of justice, or some other legitimate policy of the courts. The panel concluded that Judge Jones acted outside his discretion by failing to provide a valid reason to deny the United States attorney's application for pro hac vice admission, and held that the requirement of clear error was satisfied. The panel further held that the United States had no other means to obtain relief, and the United States was harmed when the United States attorney was denied pro hac vice admission. The panel also held that the fact that Judge Jones' order was not an isolated occurrence weighed in favor of granting mandamus relief when the petition was filed. Finally, the panel held that the district court order raised important issues. After weighing the *Bauman* factors, the panel concluded that it was appropriate to offer guidance to the district court.

Judge Wallace concurred only in the judgment to deny the writ of mandamus because Judge Jones's reversal of his prior order denying admission to United States attorneys rendered unnecessary the government's petition for a writ of mandamus. Judge Wallace stated that the proper, and more effective, place from which the government may obtain assurances that Judge Jones would discontinue his practice of routinely denying admission to the government's out-of-state attorneys, and then reversing course when such denials

became subject to appellate review, was the Judicial Council of the Circuit.

**COUNSEL**

Kathryn Keneally, Assistant Attorney General; Tamara W. Ashford, Principal Deputy Assistant Attorney General; Gilbert S. Rothenberg (argued), Michael J. Haungs, and Ivan C. Dale, Attorneys, Tax Division, United States Department of Justice, Washington, D.C., for Petitioner.

No appearance for Respondent.

No appearance for Real Parties in Interest.

**OPINION**

M. SMITH, Circuit Judge:

The United States has filed a petition for a writ of mandamus challenging a district judge's policy restricting the pro hac vice admission of government attorneys. After the petition was filed, the district judge reversed his previous order denying an attorney in this case pro hac vice admission. The United States contends that the district judge's reversal of his previous order did not render this controversy moot, and requests that we exercise our supervisory and advisory mandamus power to issue guidance to the district court. We agree that the controversy remains live, conclude that the district court erred, and find that guidance to the district court is appropriate. We decline to issue a formal writ of

mandamus because it would not be an effective remedy in this case, and accordingly deny the petition without prejudice.

## FACTUAL AND PROCEDURAL BACKGROUND

This is one of at least two cases in which the United States has filed petitions for writs of mandamus to the district court challenging District Judge Robert C. Jones's policy of denying the applications for pro hac vice admission of attorneys for the Department of Justice (DOJ) who are not admitted to the Nevada bar.

## I.  Proceedings Before The District Court

The underlying litigation in *United States v. Malikowski*, No. 13-cv-470-RCJ-VPC (D. Nev.), involves an action brought by the United States to collect income taxes from an individual.  The DOJ Tax Division designated attorney Virginia Cronan Lowe, a member of the Massachusetts bar, to litigate the case,  and the local U.S. Attorney's Office filed a motion to permit Lowe to appear.  Judge Jones denied the motion.  The order cited District of Nevada Local Rule IA 10-3[1] and stated "[b]efore the Court will permit Ms. Lowe to practice before this Court, the Court requires a showing that the Nevada admitted Assistant United States Attorneys in our judicial district are incapable of handling this matter."

It appears that Judge Jones has a policy of denying out-of-state government attorneys pro hac vice admission.  Judge Jones described this policy to attorneys in *United States v.*

---

[1] Local Rule IA 10-3 provides that government attorneys shall, on motion of the U.S. Attorney of the District, be permitted to practice, "[u]nless otherwise ordered by the Court . . . ."

*Walker River Irrigation District* (*Walker River*), No. 3:73-cv-00127-RCJ-VPC (D. Nev.), a case involving claims of the United States and the Walker River Paiute Tribe (the Tribe) to water rights in the Walker River basin. Andrew Guarino and David Negri, DOJ Environment and Natural Resources Division attorneys based in Denver, Colorado and Boise, Idaho, respectively, appeared by telephone at one of the first status conferences in *Walker River* held before Judge Jones. Both had previously filed notices of appearance in the case. After Guarino and Negri introduced themselves at the status conference, Judge Jones stated: "You folks will see in other cases . . . that I am entering orders disapproving Washington, D.C., counsel appearance, in particular in tax cases and in some environmental cases, and insisting upon appearance only by the local U.S. Attorney or adjacent districts of the U.S. Attorney." Judge Jones assured Guarino and Negri that "those orders will not apply to this case[,] at least to the appearances so far."

Approximately two months later, Guarino and Negri appeared in person before Judge Jones. Judge Jones asked whether Guarino and Negri had been granted pro hac vice status, and cited Local Rule IA 10-3. Judge Jones again stated that he was "developing a policy" of "disallowing" or "debarring" U.S. Attorneys from Washington, D.C. because of concerns about their adherence to "ethical standards," but once again assured Guarino and Negri that he would allow them to appear in this case.

Soon thereafter, the lead counsel for the United States, who had handled *Walker River* for over a decade, filed a notice of withdrawal stating that Guarino would replace her as lead counsel. The local U.S. Attorney's Office filed a motion to allow Guarino and Negri to practice before the

court. While the motion was pending, Guarino and Negri appeared before Judge Jones and the magistrate judge to whom the case was assigned.

Several months later, Judge Jones issued an order denying Guarino and Negri permission to practice before the district court. Like the order in *Malikowski*, the *Walker River* order cited Local Rule IA 10-3 and stated "[b]efore the Court will permit Mr. Negri and Mr. Guarino to practice before this Court, the Court requires a showing that the Nevada admitted Assistant United States Attorneys in our judicial district are incapable of handling this matter."

The orders in *Malikowski* and *Walker River* were not isolated occurrences. In at least four other cases, Judge Jones has refused to allow appearances by attorneys for the federal government who were not admitted to the Nevada bar.[2]

## II. Mandamus Proceedings

The United States filed petitions for writs of mandamus in *Malikowski* and *Walker River*. The petitions sought an

---

[2] For instance, he refused to allow attorneys for the Office of the United States Trustee, each of whom lived and worked in Nevada, to appear in *In re Hofsaess*, No. 2:13-cv-01161-RCJ (D. Nev.), because they were not members of the Nevada bar. He issued an order denying DOJ attorneys from Alaska and Washington D.C. permission to appear in *Great Basin Resource Watch v. U.S. Bureau of Land Management*, No. 3:13-cv-00078-RCJ-VPC (D. Nev.), absent a showing that the local U.S. Attorney's Office "are incapable of handling the matter." He issued similar orders in *Nevada Association Services, Inc. v. Yanke*, No. 2:13-cv-01386-RCJ-CWH (D. Nev.), and *EEOC v. Wells Fargo Bank*, No. 3:13-cv-00528-RCJ-WCG (D. Nev.).

order directing Judge Jones to grant the motions for pro hac vice admission he had denied.

The Ninth Circuit panels to which the petitions were initially assigned issued orders requesting Judge Jones to respond to the petitions if he so desired. In response, Judge Jones granted the United States' motions in *Malikowski* and *Walker River*, allowing Lowe, Guarino, and Negri to appear.[3]

Because the specific relief the United States requested in its petitions had been provided, the United States was ordered to file supplemental briefing regarding whether the petitions were moot. In its supplemental briefing, the United States argues that the petitions are not moot, and requests that we exercise our "supervisory mandamus authority to correct the district judge's improper interference with the government's choice of counsel and the judge's usurpation of responsibilities for conducting and supervising litigation that Congress has expressly delegated to the Attorney General."

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction to issue writs of mandamus pursuant to the All Writs Act, 28 U.S.C. § 1651. We assess whether a writ of mandamus is warranted by weighing five factors enumerated in *Bauman v. U.S. District Court*, 557 F.2d 650 (9th Cir. 1977).

---

[3] Judge Jones dismissed the claims of the United States and entered judgment in *Walker River* on May 28, 2015.

## DISCUSSION

The United States contends that the district court exceeded its authority "[b]y imposing its own standard as to when and under what circumstances Justice Department officers may litigate a case in the District of Nevada . . . ."

Before we may reach the merits of the United States' arguments, we must first resolve whether this controversy was rendered moot when the district court reversed the orders from which the original mandamus petitions sought relief. If the controversy remains live, we must also decide whether it is appropriate to offer guidance to the district court when there are no longer any orders we may reverse or vacate by issuing a writ of mandamus.

We find that the controversy remains live. We conclude that the district court committed clear error and that guidance is necessary. However, because we expect that the district court will follow this guidance without our issuing a formal writ, and because the district court has already done the act the petition asks us to compel it to do, we deny the petition without prejudice.

## I.   Mootness

After the United States filed its petition for a writ of mandamus, Judge Jones reversed his previous order denying Lowe permission to appear. We conclude that this did not render this controversy moot.

"A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer 'live' or the parties lack a legally

cognizable interest in the outcome.'" *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 726 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (per curiam)). "A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000) (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968)) (internal quotation marks omitted). It is true that a petition for a writ of mandamus directed to a district judge will ordinarily be rendered moot when the judge performs the act the petitioner seeks to compel through the writ. *Compare Penn-Central Merger and N&W Inclusion Cases*, 389 U.S. 486, 503 (1968), *and Williams v. Simons*, 355 U.S. 49, 57 (1957) (per curiam), *with Armster v. U.S. Dist. Court*, 806 F.2d 1347, 1360–61 (1986) (observing that "[a] finding of mootness would be particularly inappropriate" in an advisory mandamus proceeding, the purpose of which "is to provide guidance to all district court judges . . . ."). However, the traditional exceptions to mootness also apply to mandamus proceedings. *See Phoenix Newspapers, Inc. v. U.S. Dist. Court*, 156 F.3d 940, 945–46 (9th Cir. 1998) (finding that a petition for mandamus was not moot where issue was capable of repetition, yet evading review). "It is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Friends of the Earth*, 528 U.S. at 189 (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). A case is not moot if the challenged conduct can "reasonably be expected to recur." *Id.*

We find it is reasonably likely that Judge Jones will again deny the pro hac vice applications of attorneys for the United

States because he has done so at least once after he reversed his order denying pro hac vice admission in this case. In *Great Basin Resource Watch v. U.S. Bureau of Land Management*, No. 13-cv-00078-RCJ-VPC (D. Nev.), Judge Jones denied a motion requesting that a DOJ attorney who was a member of the North Dakota Bar be allowed to appear. The United States filed a motion for reconsideration, which Judge Jones denied on July 23, 2014, *after* he allowed Lowe to appear in this case.

Judge Jones's reasoning in the *Great Basin* order leads us to conclude that his decision to reverse course in the present case was not an acknowledgment that his previous orders were wrongly decided. *See Knox v. Serv. Employees Intern. Union*, 132 S. Ct. 2277, 2287 (2012) (holding that a union's voluntary cessation of the challenged conduct did not render the case moot, in part because the union continued to defend the practice's legality); *Armster*, 806 F.2d at 1359 ("It has long been recognized that the likelihood of recurrence of challenged activity is more substantial when the cessation is not based upon a recognition of the initial illegality of that conduct."). The *Great Basin* order asserted that a district court has "inherent authority to determine that an out-of-state, unadmitted lawyer may not properly appear before it." It also stated that Judge Jones was willing to admit out-of-state government lawyers only if the local United States Attorney "affirmatively represents, at oral argument, that he is unable to effectively litigate this case without the assistance of out-of-state counsel . . . ." This order leaves us with little doubt that Judge Jones may continue to deny the pro hac vice applications of attorneys for the United States. For this reason, this controversy remains live, and we have jurisdiction to consider the petition.

## II.  Whether We May Review Issues Raised in the Petition if the Writ Is No Longer An Effective Remedy

While the reversal of the challenged order did not render this controversy moot, it rendered a formal writ of mandamus a superfluous or ineffective remedy here.  Historically, a writ of mandamus was an order compelling a court or officer to act.  *See Marbury v. Madison*, 5 U.S. 137, 147 (1803) ("[A] writ of mandamus is 'a command . . . directed to any person, corporation or inferior court, requiring them to do some particular thing therein specified, which appertains to their office and duty . . . .'" (emphases omitted) (quoting 3 WILLIAM BLACKSTONE, COMMENTARIES *110)).  There is no specific act the United States would have us compel the district court to do, either in this case or another case, nor is there any order we may vacate.  The challenged order has already been reversed.  We recognize the United States has a continuing interest in receiving assurances that Judge Jones will not deny its attorneys pro hac vice admission in the future.  But we do not believe we can craft a formal writ of mandamus that would provide such assurances.  *Cf. United States v. Hall*, 145 F.2d 781, 784 (9th Cir. 1944) ("[W]e have no power to consider the petition in the broad and general nature of the prayer but . . . we have such power to the extent that the petition applies to the specific case out of which [the judge's] rulings arose."[4]).  Therefore, while there may be a continuing need to decide this case, "issuance of a writ would

---

[4] The petition in *Hall* requested "that Judge Hall be directed to recognize the authority of the Attorney General to assign condemnation matters to Irl D. Brett and staff, to recognize the authority of Mr. Brett and his assistants to represent the United States in such proceedings, and to assume jurisdiction over all pleadings and motions filed by Mr. Brett and his staff on behalf of the United States in condemnation proceedings." 145 F.2d at 783.

be an empty gesture." *United States v. Brooklier*, 685 F.2d 1162, 1173 (9th Cir. 1982). *But see In re Washington Post Co.*, 807 F.2d 383, 393 (4th Cir. 1986) (issuing a writ of mandamus to vacate a district court's orders closing hearings even though the hearings had already been held).

To provide the assurances the United States seeks, we must opine on the merits of the issues raised in the petition, with confidence that the district court will follow our guidance in future cases even if no writ issues. In cases where intervening events have rendered the writ an ineffective or superfluous remedy, but where the controversy nonetheless remains live, we have occasionally reviewed the district court's decision for error while withholding a formal writ. *See Phoenix Newspapers*, 156 F.3d at 952; *Brooklier*, 685 F.2d at 1173. In *United States v. Brooklier*, we considered a petition for a writ of mandamus brought by a newspaper company and a reporter challenging a number of orders by a district court closing criminal proceedings to the press and refusing to release transcripts.[5] 685 F.2d at 1165. We reviewed the challenged orders in a mandamus proceeding after the trial had concluded and the transcripts had been released, *id*. at 1165, 1173, and concluded that the district court erred in a number of respects. *Id.* at 1165–73. We found, however, that these errors were "far from clear" at the time the district court ruled, and determined that mandamus should not issue. *Id*. at 1173. We observed that "although the controversy is not moot under controlling authority, in view of the completion of the trial and the release of the transcripts, issuance of a writ would be an empty gesture." *Id*.

---

[5] The petitioners also filed an appeal, which we dismissed for lack of standing. *Brooklier*, 685 F.2d at 1165–66.

We confronted similar issues in *Phoenix Newspapers, Inc. v. U.S. District Court.* There we reviewed, on a petition for a writ of mandamus, whether a district court erred by sealing a hearing transcript. 156 F.3d at 943. At the time of our review, the transcripts had been released. *Id*. at 945. We nonetheless concluded that the controversy was not moot, *id*., proceeded to address the issues raised in the petition, and found that the district court erred. *Id*. at 951. We did not, however, issue a writ of mandamus because we were not "persuaded that mandamus [was] the appropriate remedy," in part because the transcripts had already been released. *Id*. at 952.

*Brooklier* and *Phoenix Newspapers* establish that we are not categorically precluded from opining on the merits of a mandamus petition when issuance of the writ would no longer be effective.[6] Our cases do not offer guidance about when it is appropriate to reach the merits if no formal writ may issue. But we think it clear that we should only offer guidance to the district court if the writ would have been an appropriate remedy at the time the petition was filed. This insures that mandamus proceedings do not supplant the normal appeals process. In addition, we should be satisfied

---

[6] *Brooklier* and *Phoenix Newspapers* do not authorize the uncabined use of mandamus proceedings to review district court decisions for error where the prerequisites for the issuance of mandamus are not satisfied. In the typical mandamus proceeding, we should avoid identifying errors of law in a district court's order if it is clear that the writ is not an appropriate remedy. *See In re Am. Fed'n of Gov't Employees, AFL-CIO*, 837 F.2d 503, 507 (D.C. Cir. 1988) (denying petition for writ of mandamus and observing that "[w]here there's no remedy, there's no need to decide if there was a wrong"). Such a practice insures that mandamus proceedings are not used as a substitute for the normal appeals process. *See Ex parte Fahey*, 332 U.S. 258, 260 (1947).

that there is a compelling reason to review the district court's decision for error when the specific relief sought has already been granted. *Cf. Armster*, 806 F.2d at 1361 (declining to withdraw prior mandamus opinion where "a strong public interest in having the legality of the challenged procedure determined remains" (internal quotation marks omitted)). This allows for review of important issues that would otherwise escape review, while insuring that such review is limited to truly extraordinary circumstances.

## III.    Whether Mandamus Was Available When the Petition Was Filed

We now consider whether mandamus relief would have been appropriate at the time the petition was filed. Mandamus "is a 'drastic and extraordinary' remedy 'reserved for really extraordinary causes.'" *Cheney v. U.S. Dist. Court*, 542 U.S. 367, 380 (2004) (quoting *Ex parte Fahey*, 332 U.S. 258. 259–60 (1947)). "As the writ is one of 'the most potent weapons in the judicial arsenal,' [*Will v. United States*, 389 U.S. 90, 107 (1967)], three conditions must be satisfied before it may issue." *Id*. "First, 'the party seeking issuance of the writ [must] have no other adequate means to attain the relief he desires . . . .'" *Id*. (quoting *Kerr v. U.S. Dist. Court*, 426 U.S. 394, 403 (1976)). Second, the petitioner's right to issuance of the writ must be "clear and indisputable." *Id*. at 381 (quoting *Kerr*, 426 U.S. at 403) (internal quotations marks omitted). "Third, even if the first two prerequisites have been met, the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Id*.

To determine whether mandamus relief is appropriate, we weigh five factors enumerated in *Bauman v. U.S. District Court*,**[7]** 557 F.2d 650, 654–55 (9th Cir. 1977):

> (1) The party seeking the writ has no other adequate means, such as a direct appeal, to attain the relief he or she desires. (2) The petitioner will be damaged or prejudiced in a way not correctable on appeal. (This guideline is closely related to the first.) (3) The district court's order is clearly erroneous as a matter of law. (4) The district court's order is an oft-repeated error, or manifests a persistent disregard of the federal rules. (5) The district court's order raises new and important problems, or issues of law of first impression.

*Id*. (citations omitted). The *Bauman* factors are not exhaustive, *see In re Cement Antitrust Litig.*, 688 F.2d 1297, 1301 (9th Cir. 1982) (listing additional considerations), and "should not be mechanically applied," *Cole v. U.S. Dist. Court*, 366 F.3d 813, 817 (9th Cir. 2004). While all the factors need not be present to issue the writ, *id.*, "the absence of factor three–clear error as a matter of law–will always defeat a petition for mandamus . . . ." *DeGeorge v. U.S. Dist. Court*, 219 F.3d 930, 934 (9th Cir. 2000) (internal quotation marks omitted).

---

**[7]** The *Bauman* factors are consistent with the Supreme Court's most recent discussion of mandamus in *Cheney v. U.S. District Court*, 542 U.S. 367 (2004), and incorporate the "conditions" announced therein. We have therefore continued to apply the *Bauman* factors without separately considering the three conditions described in *Cheney*. *See, e.g.*, *Perry v. Schwarzenegger*, 591 F.3d 1126, 1136–38 (9th Cir. 2009) (citing *Cheney* and applying the *Bauman* factors).

## A. Clear Error

We begin with the third *Bauman* factor, whether "[t]he district court's order is clearly erroneous as a matter of law," *Bauman*, 557 F.2d at 654–55, since "failure to show clear error may be dispositive of the petition." *Cohen v. U.S. Dist. Court*, 586 F.3d 703, 708 (9th Cir. 2009). "The clear error standard is significantly deferential and is not met unless the reviewing court is left with a 'definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 623 (1993)) (internal quotation marks omitted). "We normally review a denial of a motion to appear *pro hac vice* for abuse of discretion," *United States v. Walters*, 309 F.3d 589, 591 (9th Cir. 2002), and therefore our review of a decision to deny pro hac vice admission is especially deferential in a mandamus proceeding. *See Munoz v. Hauk*, 439 F.2d 1176, 1179 (9th Cir. 1971) (per curiam). Notwithstanding the high degree of deference appropriate here, it is clear to us that the district court acted outside its discretion in denying Lowe's application for pro hac vice admission.

We begin by determining whether the district court properly interpreted the District of Nevada's standards governing the pro hac vice admission of government attorneys. The court denied the motion to admit Lowe pursuant to Nevada Local Rule IA 10-3. The rule provides:

> *[u]nless otherwise ordered by the Court*, any nonresident attorney who is a member in good standing of the highest court of any state, commonwealth, territory or the District of Columbia, who is employed by the United

> States as an attorney and, while being so
> employed, has occasion to appear in this
> Court on behalf of the United States, shall,
> upon motion of the United States Attorney or
> the Federal Public Defender for this District
> or one of the assistants, be permitted to
> practice before this Court during the period of
> such employment.

(emphasis added). The court interpreted the first clause of the rule to confer  discretion to deny pro hac vice admission to attorneys for the United States who are not members of the Nevada bar.  We generally defer to a district court's interpretation of its local rules, *Bias v. Moynihan*, 508 F.3d 1212, 1223 (9th Cir. 2007), and agree that the rule appears to give district judges discretion to deny attorneys for the United States permission to appear pro hac vice.

However, that discretion is not unbounded.  Local Rule IA 10-3 does not empower a district court to refuse pro hac vice admission arbitrarily.  *See Zambrano v. City of Tustin*, 885 F.2d 1473, 1483 (9th Cir. 1989) ("Admission to a state bar creates a presumption of good moral character that cannot be overcome at the whims of the District Court." (quoting *In re Evans*, 524 F.2d 1004, 1007 (5th Cir. 1975) (internal quotations marks omitted))); *cf. Munoz*, 439 F.2d at 1179 (expressing confidence that the district judge "will not exercise his discretionary power arbitrarily" and therefore declining to "fix precise guidelines" governing pro hac vice admission under a district's local rules).  Therefore, a district court must articulate a valid reason for its exercise of discretion. *See Roma Constr. Co. v. aRusso*, 96 F.3d 566, 577 (1st Cir. 1996); *cf. United States v. Ries*, 100 F.3d 1469, 1472 (9th Cir. 1996) (holding, in a criminal case, that "[i]n

denying a pro hac vice application, the judge must articulate his reasons, for the benefit of the defendant and the reviewing court").

We have offered little guidance about what constitutes a valid reason for denying pro hac vice admission in a civil case. Some of our sister circuits permit district courts to deny an application for pro hac vice admission only in rare circumstances. For instance, the Fifth Circuit has held that

> [a]n applicant for admission pro hac vice who is a member in good standing of a state bar may not be denied the privilege to appear except "on a showing that in any legal matter, whether before the particular district court or in another jurisdiction, he has been guilty of unethical conduct of such a nature as to justify disbarment of a lawyer admitted generally to the bar of the court."

*In re Evans*, 524 F.2d at 1007 (quoting *Sanders v. Russell*, 401 F.2d 241, 247–48 (5th Cir. 1968)). The Eleventh Circuit has continued to apply this stringent standard following its split from the Fifth Circuit. *See Schlumburger Techs., Inc. v. Wiley*, 113 F.3d 1553, 1561 (11th Cir. 1997) ("Absent a showing of unethical conduct rising to a level that would justify disbarment, the court *must* admit the attorney."). In other circuits, district courts have broader discretion to refuse pro hac vice admission. For instance, the Sixth Circuit has held that an attorney's pro hac vice admission may be revoked where conflicts of interest exist, or where "some evidence of ethical violations was present." *D.H. Overmeyer Co., Inc. v. Robson*, 750 F.2d 31, 34 (6th Cir. 1984). And the Fourth Circuit has held that a district court may deny an

attorney permission to appear pro hac vice based on the attorney's "unlawyerlike conduct in connection with the case in which he wished to appear." *Thomas v. Cassidy*, 249 F.2d 91, 92 (4th Cir. 1957) (per curiam).

We need not announce specific factors that should inform a district court's exercise of its discretion to deny pro hac vice admission. To resolve this case, we need only define the outer limits of that discretion. At minimum, a court's decision to deny pro hac vice admission must be based on criteria reasonably related to promoting the orderly administration of justice, *see Ries*, 100 F.3d at 1471, or some other legitimate policy of the courts, *see Roma Constr. Co.*, 96 F.3d at 577 (concluding that a district court abused its discretion where its decision to deny pro hac vice admission was "based on criteria that are not set forth in writing, that do not reasonably support its action, and that do not appear to respond to any general policy of the District . . . .").

We recognize that "counsel from other jurisdictions may be significantly more difficult to reach or discipline than local counsel." *Ries*, 100 F.3d at 1471. However, "[a]dmission to the state bar is the essential determinant of professional ethics and legal competence," and, in practice, "the application process for admission before the federal district courts is generally perfunctory and pro forma." *Zambrano*, 885 F.2d at 1483. Therefore, if a court has ethical doubts about an attorney who is in good standing with a state bar, it must articulate some reasonable basis for those doubts before

denying the attorney's application for pro hac vice admission.[8]

We conclude that the district court's decision to deny pro hac vice admission to Lowe was arbitrary, and therefore lay outside the district court's discretion. In the order denying Lowe's motion, the district court found that she was an active member in good standing of the Massachusetts bar. The district court nonetheless denied the motion, stating: "[b]efore the Court will permit Ms. Lowe to practice before this Court, the Court requires a showing that the Nevada admitted Assistant United States Attorneys in our judicial district are incapable of handling this matter." The district court cited no reason, except its own policy, for refusing to admit Lowe. We note that Judge Jones has explained in other cases that he adopted his policy of refusing to admit government attorneys pro hac vice based on doubts about "the ethical commitments" of government attorneys. Generalized doubts about all government attorneys' ethical commitments are not valid grounds for denying an individual attorney's application for pro hac vice admission. We therefore conclude that Judge Jones acted outside his discretion by failing to provide a valid reason to deny Lowe's application for pro hac vice admission.

It is particularly important that a district court provide a valid reason for denying pro hac vice admission where, as here, the attorney seeking admission represents the United States. The Attorney General has clear statutory authority to choose which attorneys will represent the United States in

---

[8] A district court would clearly act within its discretion in denying pro hac vice admission if, for example, an attorney's actions led the court to conclude the attorney would not "abide by the court's rules and practices" or "be readily answerable to the court." *Ries*, 100 F.3d at 1471.

litigation.  *See* 28 U.S.C. §§ 515(a), 517; *Hall*, 145 F.2d at 783–84.  That authority does not mandate that district courts automatically grant government attorneys' applications for pro hac vice admission.  *See United States v. U.S. Dist. Court*, 694 F.3d 1051, 1059 (9th Cir. 2012) ("When the United States stands as a party before the court, the authority of the Attorney General is no greater than that of any other party. The Attorney General is not independent of the court's authority, including its authority over a settlement conference.").  But "the federal government, though not independent of the court's authority, is also not like any other litigant," *id*., and a  district court should "consider the unique position of the government as a litigant in determining whether to exercise its discretion," *In re Stone*, 986 F.2d 898, 903 (5th Cir. 1993).  For example, "[i]t is not open to serious dispute that the Government is a party to a far greater number of cases on a nationwide basis than even the most litigious private entity . . . ." *United States v. Mendoza*, 464 U.S. 154, 159 (1984).  Given the volume of litigation in which the government is a party, arbitrary interference with the government's choice of counsel risks burdening the executive branch in the discharge of its duties.

Such interference also risks creating the impression that the courts are intruding upon the traditional prerogatives of the political branches.  "[C]ourts should not risk becoming 'monitors of the wisdom and soundness of Executive action.'" *In re Stone*, 986 F.2d at 904 (quoting *Laird v. Tatum*, 408 U.S. 1, 15 (1972)).  That risk is particularly acute where, as here, a court adopts a policy that singles out attorneys from specific departments and offices for greater scrutiny.  Moreover, some of Judge Jones's comments risked giving the impression that his admission policy was motivated by his disagreement with the enforcement priorities

of specific federal agencies. For instance, during a proceeding in *In re Hofsaess*, No. 2:13-cv-01161-RCJ (D. Nev.), Judge Jones stated:

> My experience has been, in a number of cases, that when I admit out-of-state licensed attorneys for the U.S. Government, that they feel no obligation to me under the ethical standards of the Nevada Bar. . . . *And some of the directions taken by the Internal Revenue Service and attorneys out of and licensed out of Washington with respect to that is just abhorrent to me.*

(emphasis added). Similarly, an order denying a motion for reconsideration in *Great Basin Resource Watch v. U.S. Bureau of Land Management*, No. 13-cv-00078-RCJ-VPC (D. Nev.), stated: "[t]he local United States Attorney, Mr. Daniel G. Bogden, serves under an Attorney General who, *under the guise of prosecutorial discretion, selectively enforces laws to further political objectives that ought to be left to the legislature.* There is simply no presumption that his subordinates are above ethical reproach." (emphasis added). Because Judge Jones did not articulate a valid reason for his pro hac vice admission policy, comments like these created a real risk that the policy would, rightly or wrongly, be viewed as an encroachment on the domain of the political branches.

Because the requirement of clear error is satisfied here, we turn to the other four *Bauman* factors.

## B. Whether the United States Has No Other Means to Obtain Relief And Whether the United States Will Be Harmed in a Way Not Correctable on Appeal

"The first *Bauman* factor highlights the need for mandamus to be used only when no other realistic alternative is (or was) available to a petitioner." *Cole*, 366 F.3d at 817; *see also Cheney*, 542 U.S. at 367 (describing absence of "adequate means to attain . . . relief" as a "prerequisite" to issuance of the writ). The United States could not have obtained relief through an appeal in this case because "the denial of a petition for admission to a district court bar is neither a final order appealable under 28 U.S.C. § 1291 . . . nor an interlocutory order appealable under 28 U.S.C. § 1292." *Gallo v. U.S. Dist. Court*, 349 F.3d 1169, 1176 (9th Cir. 2003); *see also Cohen*, 586 F.3d at 710 ("lost choice of counsel cannot be adequately remedied through means other than mandamus . . . ."). We are therefore satisfied that the writ is not being "used as a substitute for the regular appeals process." *Cheney*, 542 U.S. at 380–81.

It is true that the United States could have filed a formal complaint against Judge Jones with the Judicial Council of the Ninth Circuit before seeking a writ of mandamus. *See* 28 U.S.C. §§ 351–53. But the United States could not have obtained the relief it seeks by filing a misconduct complaint. As Judge Wallace's concurrence in the judgment notes, the Judicial Council's procedures "are not intended to provide an alternative avenue for appealing a judge's rulings in a particular case . . . ." *In re Charge of Judicial Misconduct*, 613 F.2d 768, 769 (9th Cir. 1980). The United States could have complained that Judge Jones's "pattern and practice of arbitrarily and deliberately disregarding prevailing legal standards" amounted to "misconduct." *See In re Judicial*

*Conduct & Disability*, 517 F.3d 558, 562 (U.S. Jud. Conf. 2008). However, the Judicial Conference of the United States has cautioned that "the characterization of such behavior as misconduct is fraught with dangers to judicial independence." *Id*. For this reason,

> a cognizable misconduct complaint based on allegations of a judge not following prevailing law or the directions of a court of appeals in particular cases must identify clear and convincing evidence of willfulness, that is, clear and convincing evidence of a judge's arbitrary and intentional departure from prevailing law based on his or her disagreement with, or willful indifference to, that law.

*Id*. Indeed, because "[t]he Judicial Council is not a court and thus cannot determine whether a judge's rulings are erroneous," "a complainant must at a minimum allege that the rulings in question have been reversed on appeal." *In re Judicial Misconduct*, 631 F.3d 961, 962 (9th Cir. 2011). Because the government's requested relief relates to the merits of Judge Jones's rulings, and those rulings have not been reversed on appeal, it appears that the Judicial Council could not provide the relief that the government seeks in its mandamus petition. Judge Wallace's point is well taken that Judge Jones's practice of reversing himself after the government has filed a petition for a writ, thereby insulating his rulings from review, may itself qualify as the type of conduct properly addressed by the Judicial Council. However, by its terms, the government's mandamus petition challenges a particular order denying a particular motion, not a pattern and practice of routinely reversing his orders to

insulate them from appellate review. We do not see why the government should be forced to recharacterize the relief it seeks in order to seek relief from the Judicial Council. Indeed, the prospect that the government would be forced to request different relief from the Judicial Council strongly suggests that pursuing a misconduct complaint was not an adequate alternative means to obtain relief.

With respect to the related second *Bauman* factor, we have recognized that a lost choice of counsel produces "harm [that] is not correctable on appeal." *Cohen*, 586 F.3d at 710 (citing cases). The United States was harmed when Lowe was denied pro hac vice admission. This immediate harm was remedied when Judge Jones granted Lowe's application for pro hac vice admission after the petition was filed. However, we recognize that the United States also has interests in avoiding uncertainty and delay in securing pro hac vice admission of government attorneys in the future. It cannot adequately protect these interests by filing successive petitions for writs of mandamus, even if the petitions again cause Judge Jones to admit the attorneys. The United States will still be inconvenienced by the delay.

The first and second *Bauman* factors weighed in favor of issuing mandamus when the petition was filed, and weigh in favor of offering guidance to the district court.

## C. Whether the District Court's Order Is An Oft-Repeated Error

There are several other cases in which Judge Jones has issued similar orders. The fact that Judge Jones's order in this case was not an isolated occurrence weighed in favor of granting mandamus relief when the petition was filed. We

place significant weight on this factor in this case because it demonstrates that the United States has a continuing need for relief, and that guidance is therefore warranted, even though Lowe has been admitted.

### D. Whether the District Court's Order Raises Important Problems or Issues of First Impression

The order at issue here raises important problems. We find it highly relevant that the conduct complained of could, if allowed to continue, burden the Executive in the performance of its duties. *See Cheney*, 542 U.S. at 382 ("Accepted mandamus standards are broad enough to allow a court of appeals to prevent a lower court from interfering with a coequal branch's ability to discharge its constitutional responsibilities."). We also note that this dispute resembles a handful of other cases in which we have issued mandamus to clarify the authority of the district courts in litigation overseen by the Attorney General. *See United States v. U.S. Dist. Court*, 694 F.3d 1051 (9th Cir. 2012); *Hall*, 145 F.2d 781. This factor weighed in favor of mandamus relief when the petition was filed and weighs in favor of offering guidance to the district court even though a formal writ is no longer necessary.

### E. Mandamus Relief Would Have Been Appropriate, But a Formal Writ Is No Longer Necessary

After weighing the *Bauman* factors, we are convinced that it is appropriate to offer guidance to the district court. Issuing a formal writ would have been an appropriate remedy but for Judge Jones's voluntary cessation, and there is a continuing need to decide the issues the petition raises. It is true, as Judge Wallace notes in his concurrence in the judgment, that

it will often be possible to resolve disputes about judicial administration informally through, for instance, the involvement of chief district judges. Informal efforts have been undertaken in this case. The record does not disclose whether those efforts have caused Judge Jones to modify or abandon his pro hac vice policy. However, it is clear to us that, by one important measure, the informal efforts undertaken here have not proven effective, because they have not produced a public record upon which the government may rely if the challenged conduct recurs. Absent a record memorializing the resolution of the issues presented by the petition, the government will continue to face considerable uncertainty about whether its attorneys will be admitted pro hac vice.

For reasons discussed *supra*, it is not necessary to issue a formal writ in this case. We are confident that the district court will conform its decisions to the principles we announce here. *See Phoenix Newspapers*, 156 F.3d at 952; *Armster v. U.S. Dist. Court*, 792 F.2d 1423, 1431 (9th Cir. 1986) (*Armster I*); *Brooklier*, 685 F.2d at 1173. We accordingly deny the petition without prejudice.

## CONCLUSION

For the above reasons, we **DENY** the petition without prejudice.

WALLACE, Circuit Judge, concurring in the judgment:

I concur only in the judgment to deny the writ of mandamus. Judge Jones's reversal of his prior order denying admission to government attorneys renders unnecessary the government's petition for a writ of mandamus. This is where our analysis should end. *See In re Am. Fed'n of Gov't Emps., AFL-CIO*, 837 F.2d 503, 507 (D.C. Cir. 1988) (denying petition for writ of mandamus and observing that "[w]here there's no remedy, there's no need to decide if there was a wrong"). In my view, our statutory writ authority is an improper vehicle for providing hopeful but non-binding assurances that Judge Jones will discontinue his practice of routinely denying admission to the government's out-of-state attorneys, and then reversing course when such denials become subject to appellate review. The proper, and frankly more effective, place from which the government may obtain such assurances is the Judicial Council of the Circuit (Circuit Council).

I.

In 1939, Congress passed legislation instituting a comprehensive plan of decentralized judicial administration. The Administrative Office Act of 1939 (Act) created the Administrative Office of the United States Courts, and thereby effectively transferred responsibility for supervising court administration from the Department of Justice to the courts themselves. The primary purpose of the Act was "to furnish to the Federal courts the administrative machinery for self-improvement, through which those courts will be able to scrutinize their own work and develop efficiency and promptness in their administration of justice." H.R. Rep. No. 76-702, at 2 (1939).

Integral to this goal was the creation of a Circuit Council in each circuit to act as a local "board of directors" for the circuit. *See Chandler v. Judicial Council of the Tenth Circuit of the United States*, 398 U.S. 74, 86 n.7 (1970). Presently, the Circuit Council consists of the chief judge of the circuit, who presides, and an equal number of circuit and district judges of the circuit. 28 U.S.C. § 332(a)(1). Unlike the Judicial Conference of the Circuit, whose "purely advisory" function is "to provide an opportunity for friendly interchange among judges and between bench and bar, out of which might grow increased understanding of problems of judicial administration and enhanced cooperation toward their solution," the Circuit Council is "designed as an actual participant in the management of the judicial work of the circuit." *Chandler*, 398 U.S. at 98 (Harlan, J., concurring).

Indeed, the Circuit Council is presently vested with broad authority to "make all necessary and appropriate orders for the effective and expeditious administration of justice within its circuit." 28 U.S.C. § 332(d)(1). In aid of this authority, the Circuit Council may hold hearings, take sworn testimony, and issue subpoenas. *Id.* The Circuit Council also possesses review authority over district courts' local rules to ensure their consistency with the Supreme Court's general rules of practice, procedure, and evidence. *Id.* § 332(d)(4). Importantly, these powers come with teeth:

> All judicial officers . . . of the circuit shall promptly carry into effect all orders of the judicial council. In the case of failure to comply with an order made under this subsection, . . . a judicial council or a special committee . . . may institute a contempt proceeding in any district court in which the

> judicial officer . . . who fails to comply with the order . . . shall be ordered to show cause before the court why he or she should not be held in contempt of court.

*Id.* § 332(d)(2).

In 1980, the Judicial Conduct and Disability Act built upon the Administrative Office Act, and augmented the role of the judicial council in investigating judges whose conduct is prejudicial the "effective and expeditious administration of justice." *Id.* The Circuit Council has power to conduct investigations of such alleged conduct so long as the conduct is not "directly related to the merits of a decision or procedural ruling," *id.* § 352(b)(1)(A)(ii), and does not rise to the level of an impeachable offense. *See* J. Clifford Wallace, *Resolving Judicial Corruption While Preserving Judicial Independence: Comparative Perspectives*, 28 Cal. W. Int'l L.J. 341, 348–49 (1998).

Since its institution, the Circuit Council has been the primary administrator of discipline within the federal judiciary. Most of the Circuit Council's work in this regard is performed informally and inconspicuously, and with great effectiveness. *See generally* Charles Gardner Geyh, *Informal Methods of Judicial Discipline*, 142 U. Pa. L. Rev. 243 (1993). As one former chief judge has said: "[W]e believe [the Circuit Council's] success may be measured by its lack of visibility. We suspect that some who have criticized councils for inactivity are unmindful of the saw that still waters run deep, and that the most effective actions are often the most inconspicuous." *In re Imperial "400" Nat'l, Inc.*, 481 F.2d 41, 47 (3d Cir. 1973). Indeed, our own Circuit Council has long been successful in dealing with judicial

misconduct "through an informal mechanism, backed up by [its] power to enter orders if necessary under . . . § 332." U.S. Court of Appeals for the Ninth Circuit, *Report on the Implementation of the Judicial Conduct and Disability Act of 1980 in the Ninth Judicial Circuit* (1987). My own experience as former chief judge and as a current member of the Circuit Council bears this out. Typically, even the most serious judicial problems are resolved successfully without the filing of a formal complaint.

Occasionally, however, it may become necessary to initiate a formal complaint against a judge who (1) has "engaged in conduct," 28 U.S.C. § 351(a); (2) that is not "directly related to the merits of a decision or procedural ruling," *id.* § 352(b)(1)(A)(ii); (3) but is "prejudicial to the effective and expeditious administration of the business of the courts," *id.* § 351(a). The Judicial Code provides that "[a]ny person alleging that a judge has engaged in [such] conduct . . . may file . . . a written complaint containing a brief statement of the facts." *Id.* Alternatively, the chief judge may, on the basis of information available to him or her, "identify" a complaint through a written order "and thereby dispense with the filing of a written complaint." *Id.* § 351(b).

Once a complaint has been filed or identified, the chief judge must expeditiously review it to determine "whether appropriate corrective action has been or can be taken without the necessity for a formal investigation," or whether the facts stated in the complaint are "plainly untrue" or "incapable of being established through investigation." *Id.* § 352(a). During this process, the chief judge may request that the judge whose conduct is the subject of complaint file a written response. *Id.*

The chief judge may then issue a final written order (1) dismissing the complaint for various enumerated reasons, *see id.* § 352(b)(1); or (2) concluding that appropriate corrective action has been taken or that intervening events have rendered the complaint unnecessary, *id.* § 351(b)(2). Failing those, however, the chief judge must appoint a special committee to investigate the allegations in the complaint. *Id.* § 353(a). The committee then conducts an investigation and files a comprehensive written report with the entire Circuit Council, with recommendations for appropriate action. *Id.* § 353(c).

The Circuit Council may conduct additional investigation, dismiss the complaint, or take action against the judge whose conduct is the subject of complaint, including issuance of a private or public reprimand. *Id.* § 354(a)(1)–(2).

## II.

Instead of a non-binding advisory opinion, the statutory procedures outlined above provide the proper vehicle by which the United States may potentially obtain the assurances it seeks in this case. The government could, for example, seek a specific order from the Circuit Council under section 332 correcting Judge Jones's alleged pattern and practice of denying, as a matter of course, admission to out-of-state government attorneys, coupled with his subsequent reversal whenever such denial becomes the subject of a petition for a writ of mandamus. *See* J. Clifford Wallace, *Must We Have the Nunn Bill?*, 51 Ind. L.J. 297, 322 (1976) (observing that the Circuit Council's power to issue orders likely includes the "issuance of 'specific orders, directed to individual judges, and limited to the correction of a specific situation for which that judge can be held directly responsible,'" quoting

Comment, *The Authority of the Circuit Judicial Councils: Separation of Powers in the Courts of Appeal*, 5 Seton Hall L. Rev. 815, 860 (1974)). Indeed, "[a]n order by the Council to a district judge . . . involve[s] supervision of a subordinate judicial officer," and "in this regard, [is] not unlike the extraordinary writ of mandamus." *Chandler*, 398 U.S. at 106 (Harlan, J., concurring). Such an order may be especially appropriate given the Circuit Council's authority to review the local rules of district courts, including the local rule upon which Judge Jones relied to deny routinely admission to out-of-state government attorneys. *See* 28 U.S.C. § 332(d)(4).

Alternatively, the government could file a complaint with the Circuit Council against Judge Jones. Indeed, the House Report on the Judicial Conduct and Disability Act contemplated use of the formal complaint procedure in this very circumstance: "If a clear impediment to the administration of justice is shown . . . the circuit council could hear a case brought against a judge who is a litigant in a legal proceeding." H.R. Rep. No. 96-1313, at 8 (1980).

Of course, it bears emphasizing that the Circuit Council is not an alternative appellate forum in which to address the merits of a judge's order. *In re Charge of Judicial Misconduct*, 613 F.2d 768, 769 (1980) (the Circuit Council's procedures "are not intended to provide an alternate avenue for appealing a judge's rulings in a particular case"). Indeed, the Circuit Council does not review "objections to substantive or procedural error" because "in such cases the gravamen of the complaint is not the fitness of the judge, but the merit of his decision." *In re Charge of Judicial Misconduct*, 685 F.2d 1226, 1227 (9th Cir. 1982). Here, however, the gravamen of the government's complaint is not the merits of Judge Jones's decision to deny government attorneys admission in the

present case—otherwise the government would not still be pressing for a writ after Judge Jones reversed course, granting them the particular relief they asked us compel through a writ. Rather, the government seeks an assurance that Judge Jones's pattern and practice of routinely denying out-of-state government attorneys admission—and subsequently reversing himself to insulate such orders from appellate review—will not happen *in the future*. Such forward-looking relief is not within our statutory mandamus power as a three-judge panel, but it falls well within the statutory purview of the Circuit Council.

Indeed, the Committee on Judicial Conduct and Disability, a sub-part of the Judicial Conference of the United States, recently recognized that "a judge's pattern and practice of arbitrarily and deliberately disregarding prevailing legal standards and thereby causing expense and delay to litigants may be misconduct." *In re Judicial Conduct and Disability*, 517 F.3d 558, 562 (U.S. Jud. Conf. 2008). Subsequently, however, Judge Kozinski, during his tenure as chief judge, issued an order clarifying that to avoid the merits-related bar on judicial misconduct complaints by alleging a "pattern or practice," "a complainant must at a minimum allege that the rulings in question have been reversed on appeal," because the Circuit Council "cannot determine whether a judge's rulings are erroneous." *In re Judicial Misconduct*, 631 F.3d 961, 962 (9th Cir. 2011). But here, Judge Jones has insulated himself from appellate review by reversing course whenever a petition has been filed, thus rendering ineffective any petition for a writ of mandamus. The Supreme Court clarified decades ago, quoting our circuit's precedent, that "[a]lthough it is well established that Judicial Councils do not exist to review claims that a particular trial judge's rulings were erroneous, *In re Charge*

*of Judicial Misconduct*, 613 F.2d 768 (9th Cir. 1980), they do exist 'to provide an administrative remedy for misconduct of a judge for which no judicial remedy is available.' *In re Charge of Judicial Misconduct*, 595 F.2d 517 (9th Cir. 1979)." *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 435 n.2 (1985). *See also* Wright & Miller, Fed. Prac. & Proc. § 3939 ("Judicial council action is most obviously proper even with respect to isolated conduct if there is no apparent remedy by appeal or writ . . . ."). Judge Jones's pattern of denying admission and then reversing himself only after the government files a petition for a writ—which insulates his rulings from "remedy by appeal or writ"—likely qualifies, therefore, as the type of conduct that is most properly addressed by the Circuit Council. Even if the Circuit Council could not opine on the merits of Judge Jones's denial, moreover, it surely could prevent him from engaging in a practice of insulating his denials from appellate review.

The majority concludes that their advisory opinion is necessary because at the time the petition was filed, i.e., before Judge Jones reversed himself, the *Bauman* factors weighed in favor of issuing a writ. But *Bauman*'s first factor—whether the "party seeking the writ has no other adequate means, such as a direct appeal, to attain the relief he or she desires"— is a *prerequisite,* the Supreme Court has held, to issuance of the writ. *Cheney*, 542 U.S. at 381. The purpose of the first *Bauman* factor is to assess only the "availability" of an adequate alternative means, not to consider whether the petitioner is likely to be successful in employing it. *Bauman*, 557 F.2d 650 at 656. Indeed, *Bauman* states, "the *availability* of a direct appeal would weigh strongly against a grant of mandamus. . . . [E]ven if the grant of an interlocutory appeal from the order is not a foregone conclusion, the possibility remains . . . that a[n] appeal may

be *available*. That possibility, or uncertainty, regarding appealability militates against issuance of a writ here." *Id.* (emphasis added).

The majority is content to assume that "pursuing a misconduct complaint was not an adequate alternative means to obtain relief." However, in this case, as in *Bauman*, even though it was "not a foregone conclusion" that the United States would obtain the relief it seeks through the filing of a formal complaint, it is clear that the "availability" of an adequate alternative means—even if "uncertain[]"—militates against issuance of a writ in this case. I would therefore hold that this "prerequisite" for issuance of mandamus, *Cheney*, 542 U.S. at 381, was not satisfied here, at the time the petition was filed or after. Consequently, even under the majority's own rubric, it should not be issuing an advisory opinion in this case.

In sum, we properly denied the government's petition for a writ of mandamus because Judge Jones's voluntary reversal rendered it unnecessary. However, our denial does not leave the government without an avenue for the relief it seeks. Particularly in the present case, which involves a district judge's pattern and practice across many cases, followed by his voluntary self-reversal in those cases that become subject to appellate review, the government could, if necessary, seek relief from the Circuit Council. If the government deems it necessary to file a future misconduct complaint to address Judge Jones's alleged pattern and practice, the chief judge may determine that further investigation is warranted. In that event, if the Circuit Council's investigation supports the government's allegations, the Circuit Council may, in its discretion, issue a public reprimand providing the assurances that the government seeks.

III.

In light of the role Congress established for the Circuit Council in resolving the issues the government raises here, our court should abstain from using the blunt instrument of our section 1651 writ authority to offer nonbinding guidance to district courts, especially when subsequent events render issuing the writ unnecessary. *See Richardson-Merrell*, 472 U.S. at 435 n.2 (observing that action by the Circuit Council is appropriate where judicial remedies are unavailable).

Our court has strayed in recent years from the traditional understanding that our mandamus authority is sharply limited to truly extraordinary circumstances in which no alternative remedy—judicial or administrative—is available. As the majority points out, our court has sometimes offered "advice" to district judges on legal issues for which there was no judicial writ remedy when it has concluded that the alleged wrongs were capable of repetition but evaded review. *See, e.g.*, *Phoenix Newspapers, Inc. v. U.S. Dist. Court for the Dist. of Ariz.*, 156 F.3d 940, 948–49 (9th Cir. 1998). This practice appears to be an extension of several earlier cases in which our court invoked a so-called "supervisory mandamus" authority to "provide necessary guidance to the district courts" regarding "questions of law of major importance to the administration of the district courts." *In re Cement Antitrust Litig.*, 688 F.2d 1297, 1307 (9th Cir. 1982); *see also Admiral Ins. Co. v. U.S. Dist. Court for the Dist. of Ariz.*, 881 F.2d 1486, 1491 (9th Cir. 1989) (stating that "exercise of supervisory mandamus authority" was warranted because the case involved an "important question of first impression" that would "elude review"). This in spite of there being no case or controversy before the court.

The term "supervisory mandamus" owes its existence to a blip in Supreme Court jurisprudence from the 1957 case of *La Buy v. Howes Leather Co.*, 352 U.S. 249 (1957). In *La Buy*, over a blistering dissent by Justice Brennan joined by Justices Frankfurter, Burton, and Harlan, the Court stated its belief that "supervisory control of the District Courts by the Courts of Appeals is necessary to the proper judicial administration in the federal system. The All Writs Act confers on the Courts of Appeals the discretionary power to issue writs of mandamus in . . . exceptional circumstances." *Id.* at 259–60.

Two decades later, we observed in *Bauman v. U.S. Dist. Court*, 557 F.2d 650 (9th Cir. 1977), that "[s]ince the advent of the concept of 'supervisory mandamus' in *La Buy* . . . the challenge to the federal appellate courts has been to formulate objective principles to guide the exercise of their section 1651 power." *Id.* at 653. We cautioned against the "obvious" "dangers of unprincipled use of that power," which "could readily subvert the policies underlying the finality rule" or the "congressional scheme governing interlocutory appeals," and which could "undermine the mutual respect . . . between federal trial and appellate courts." *Id.* We pointed out that "without articulable and practically applicable guidelines to govern the issuance of extra-ordinary writs, appellate judges would continually be subject to the temptation to grant such relief merely because they are sympathetic with the purposes of the petitioners' underlying actions, or because they question the trial court's ability to direct the litigation efficiently or impartially." *Id.* at 653–54. In light of those dangers, we instituted a five-factor test to bring principled guidance to the exercise of section 1651 power, recognizing that its "continuing effectiveness . . . depends on its reasoned and principled exercise." *Id.* at 654.

Despite the potentially broad interpretations that Courts of Appeals might be tempted to derive from *La Buy*, they would do well to observe that the Court has since retreated considerably from this expanded use of mandamus that it seemed to sanction in 1957. Indeed, in its most recent articulation of our statutory mandamus authority, the Court reiterated that the "traditional use of the writ in aid of appellate jurisdiction . . . has been to confine [the court against which mandamus is sought] to a lawful exercise of its prescribed jurisdiction." *Cheney v. U.S. Dist. Court for the Dist. of Columbia*, 542 U.S. 367, 380 (2004) (alteration in original) (internal quotation marks omitted). Consequently, "only exceptional circumstances amounting to a judicial usurpation of power or a clear abuse of discretion will justify the invocation of this extraordinary remedy." *Id.* (internal quotation marks and citations omitted). This is a far cry from offering advice on administrative issues, i.e., so-called "supervisory mandamus."

The foremost "prerequisite[]" to invoking statutory mandamus authority is that the party seeking issuance of the writ "have no other adequate means to attain the relief he desires." *Id.*, quoting *Kerr v. United States Dist. Court for the N. Dist. of Cal.*, 426 U.S. 394, 403 (1976); *see also Bauman*, 557 F.2d at 654. The purpose of this threshold hurdle is to "ensure that the writ will not be used as a substitute for the regular appeals process." *Cheney*, 542 U.S. at 380–81. In accordance with this principle, our mandamus authority, whether phrased as "supervisory" or not, must not be invoked as a substitute for any "other adequate means" by which the petitioner may "attain the relief he or she desires." *Bauman*, 557 F.2d at 654.

Our court should therefore avoid invoking "supervisory mandamus" authority for anything it deems to implicate questions of "major importance" whose "resolution would add importantly to the efficient and orderly administration of the district courts." *In re Cement Antitrust Litig.*, 688 F.2d at 1305. Congress has established extra-judicial mechanisms for dealing with certain issues, and we must defer to Congress, lest our so-called "supervisory" authority become a tool for scattershot resolution of important issues of court administration that Congress directed to be handled outside the normal judicial process, through the judicial administrative organization of the Circuit Council.

For example, we declined a petitioner's invitation to exercise a so-called "inherent supervisory authority" over rules implemented under 28 U.S.C. § 2071 to review certain plans issued by the district court pursuant to the Criminal Justice Act (CJA). *Russell v. Hug*, 275 F.3d 812, 820–21 (9th Cir. 2002). We refused to exercise any so-called supervisory authority over such plans because in the CJA "Congress granted to the Judicial Council a continuing authority to supervise such plans." *Id.* at 821. Because the statutory "provisions ma[d]e clear that the district court's adoption and modification of a plan under the [CJA] is an administrative matter, subject to the governance of the Judicial Council," we held that our appellate review authority under 28 U.S.C. § 1291 "does not authorize us to engage in supervisory oversight of administrative actions of the district courts." *Id.*

The same should be said about our mandamus authority in light of the statutory provisions delegating responsibility over the administrative issues presented in this appeal to the Circuit Council. The Circuit Council has statutory review authority over the local rule invoked by Judge Jones in

denying admission to non-local government attorneys. Moreover, as set forth above, the Circuit Council has statutory authority to issue orders to correct judicial conduct that is prejudicial to the "effective and expeditious administration of justice within its circuit." 28 U.S.C. § 332(d)(1). Because this authority was given by Congress to the Circuit Council, I cannot join the majority opinion. We should not use our opinion denying the government's petition for a writ of mandamus to offer the guidance of two judges on these administrative matters.

I therefore concur only in the judgment denying the writ of mandamus.